United States Court of Appeals
For the Ninth Circuit

_____

No. 20-55633

DR. JEFFREY ISAACS,

Plaintiff – Appellant,

v.

USC KECK SCHOOL OF MEDICINE,

Defendant – Appellee,

GEISEL SCHOOL OF MEDICINE
AT DARTMOUTH, DARTMOUTH HITCHCOCK MEDICAL CENTER,
NH BOARD OF MEDICINE, GIBSON, DUNN & CRUTCHER, LLP, and
JOHN or JANE DOE,

Defendants.

_____

Appeal from the United States District Court for the
Central District of California, No. 19-cv-08000

## EXCERPTS OF RECORD, VOLUME 2

Mark L. Josephs, Esq.
Bar No. 568454
Law Office of Mark L. Josephs, LLC
100 Cambridge Street, 14th Floor
Boston, MA 02114
(202) 904-4736
mark.josephs@markljosephslaw.com

# **INDEX**

| **Document** | **Page** |
|---|---|

Plaintiff's Opposition to Defendant USC's Motion for Fees,
Docket No. 110 (04/07/2020) — 008

Defendant USC Keck School of Medicine's Notice of Motion and Motion
For Attorneys' Fees and Costs, Docket No. 109 (03/17/2020) — 026

Declaration of James P. Fogelman in Support of Defendant USC Keck
School Of Medicine's Motion for Attorneys' Fees and Costs (Excerpts),
Docket No. 109 (03/17/2020) — 051

Declaration of Shannon Mader in Support of Defendant USC Keck
School Of Medicine's Motion for Attorneys' Fees and Costs,
Docket No. 109 (03/17/2020) — 055

Declaration of Katarzyna Ryzewska in Support of Defendant USC Keck
School Of Medicine's Motion for Attorneys' Fees and Costs,
Docket No. 109 (03/17/2020) — 057

Jeffrey Isaacs's Complaint for Damages, Declaratory, and Injunctive Relief,
Docket No. 1 (09/16/2019) — 059

1 | Associated Attorneys of New England
2 | Keith Mathews, Esq.
  | *Admitted Pro Hac Vice*
3 | 1000 Elm Street, Suite 803
4 | Manchester, NH 03101
  | Tel: (603) 622-8100
5 | Keith@aaone.law

6

7
8 | IN THE UNITED STATES DISTRICT COURT
  | FOR THE CENTRAL DISTRICT OF CALIFORNIA
9

10

11

12

13 | DR. JEFFREY ISAACS

14 |     Plaintiff,              Case 2:19-CV-08000-DSF-RAO

15 |        vs.            **PLAINTIFF'S OPPOSITION TO**

16 |                              **DEFENDANT USC'S MOTION**
   | DARTMOUTH HITCHCOCK MEDICAL CENTER     **FOR FEES**
17 | GEISEL SCHOOL OF MEDICINE AT DARTMOUTH
   | USC KECK SCHOOL OF MEDICINE
18 | NH BOARD OF MEDICINE;
19 | GIBSON DUNN & CRUTCHER

20 | and JOHN or JANE DOE,

21 |     Defendants.
22

23

24

25

26

27

28

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

009

## I. INTRODUCTION

1

2 In plain sight of the Court, Dr. Isaacs is being abused by Gibson Dunn and USC. Dr Isaacs is a talented
3 physician who cannot even volunteer in the national coronavirus[1] emergency, because of foul play
4 enacted by the Defendants to rob him of his medical license and competitive medical credentials.
5 Unconscionably, after torturing Dr. Isaacs for over a decade with false settlement agreements, spoliated
6 federal evidence, and ongoing process abuses (e.g. Anti-SLAPP against a devastated medical student)
7 that took a massive toll on his health and career, Gibson Dunn has crafted a sinister motion to make
8 Dr. Isaacs pay again – nearly a quarter million dollars in supposed punitive fees owed. Their rubbish
9 pending Motion must be denied and referred to federal authorities.

10

11 Dr Isaacs called out improper federal corruption in 2005 as a medical student at USC. He protested
12 specifically that an NIH director, who had overseen $30 million in NIH grants to USC's dean,
13 intervened in a dispute with a classmate – a classmate whose very admission to USC med school itself
14 was apparently the result of federal bribery.

15

16 USC's Deans and attorneys – detailed in the underlying RICO complaint – enacted a character
17 assassination campaign, ousting Dr. Isaacs from USC's medical school. Isaacs went on to achieve
18 neurosurgeon level board scores elsewhere, and signed two settlement agreements with USC. The first
19 agreement, in 2007, sealed Isaacs' retaliatory discipline at USC. The second agreement, in 2008,
20 cancelled all contracts and dismissed administrative charges. Despite the Court's order stating
21 otherwise[2], Isaacs had no written proof that USC breached these agreements until 2019, when he found
22 the AAMC profile. The AAMC profile was improperly withheld from federal discovery in 2007;
23 Defendants have not disputed that; equitable estoppel tolling of claims should have applied, and is,
24 respectfully, the subject of Ninth Circuit appeal.

25

26

27 [1] The ongoing controversy Isaacs sought to clarify with declaratory judgment, whether or not his academic records at USC were sealed and expunged, is even more apparent today than ever.
28 [2] The Court appears to be citing the NH Board decision declaration that "no evidence exists that USC ever complied with the settlement." Of course, a lack of evidence of compliance in 2015 is different from the 2019 discovery of AAMC profile breach and discovery violations.

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

010

1   Over the course of a decade, the Defendants have ratcheted up their fictional narrative against Isaacs
2   each time he seeks to simply enforce his right to be a physician. Isaacs was described as "sensitive, soft
3   spoken" by his first semester USC professor Fred Kuyt. Within weeks, USC's Deans sent armed
4   officers into his classroom and requested the NIH classmates' ex-boyfriend file a complaint that Isaacs
5   was a "threatening" danger to the class.[3] Nonetheless Dr Isaacs continued on at other hospitals, well-
6   socialized with his colleagues. Only again six years later, as the complaint alleges through John Doe,
7   or the AAMC profile, Defendants accused Isaacs of "dishonesty" and revoked his medical license, for
8   merely complying with the USC settlement agreement. Isaacs complained of retaliatory evidence
9   spoliation at Dartmouth, which resulted in Dr Jim Yong Kim's termination from the president-
10  appointed role as Head of the World Bank.

11

12  Isaacs filed the underlying claim in 2019, seeking declaratory-injunctive relief that reconciled three
13  divergent competent authority interpretations of the aforementioned settlement agreement. USC's
14  president – a close friend of Jim Yong Kim – apparently authorized hiring Gibson Dunn to arrest Dr.
15  Isaacs' claims, which had been progressing in the federal government. Gibson Dunn, eager to comply,
16  ratcheted up the allegations once again, banning Isaacs' from all USC public facilities for life, their
17  fictional narrative again insinuating something far different than the accomplished physician scientist
18  with neurosurgeon level achievements.

19

20  Gibson Dunn has hence succeeded in denying Isaacs any benefit of his settlement agreements,
21  effectively banning a talented physician scientist from ever contributing to the medical field. They have
22  humiliated and ostracized Isaacs with a new campus ban, and now, incredulously, that want the victim
23  of their legalized bullying to pay nearly a quarter million dollars in legal fees.

24

25

26

27

28  [3] The horror of the false allegations seems to have been the causation of PTSD like syndrome, and this Court ordering a
further undue punishment would seemingly compound his condition.

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

1    The Court's order stated that Gibson Dunn was protected in their issuance of the campus ban. But, as
2    Attorney Mark Austin argued from Burke Williams Sorenson, the protected speech embodied
3    underlying evidence of illegality. Put simply, if Gibson Dunn had described burying dead bodies in a
4    legal pleading, it would be absurd to grant them immunity to the underlying murder. USC and Gibson
5
6    Dunn have no right carrying on their damaging false narrative that Dr. Isaacs is some kind of campus
7    terrorist, "Dr Death" physician, or "Harvey Weinstein" rapist.[4] To the contrary, Dr. Isaacs has quietly
8    kept to himself for a decade hoping one day the legal system will free him to help others as a physician.
9    He has in this time developed computer applications used by hundreds of millions, and is awaiting a
10
11    chance to volunteer in the COVID-19 emergency. He is, by all reasonable accounts, far from the image
12    Gibson Dunn and USC endeavor to portray. Dr Isaacs was a victim of bullying at USC, plain and
13    simple. There is no reason USC should be awarded legal fees for destroying this man's career,
14    breaching their settlement, and wrongfully shaming him with a lifelong campus ban.

15

16    The Defendants use of *res judicata* is misleading, and also prompts clarification necessary of this
17    Court's order wherein it states "Plaintiff then tried to avoid the settlements, but their validity was finally
18    adjudicated against Plaintiff in 2008."

19

20    In fact, the chief reason Plaintiff tried to "avoid" the 2008 global settlement was because he feared it
21    would make the 2007 discipline sealing unenforceable, which is precisely what USC is attempting to
22
23    now do by suggesting they are the "prevailing party" on the contract dispute. Fortunately Plaintiff did
24    foresee this, and pre-empted a response from USC stipulating, declaring, and/or waiving such a
25    defense:

26

27

28    ---

[4] The worst fact-based allegation ever levied against Dr. Isaacs by USC is that he mocked the NIH classmate's entitled attitude when she vandalized a school tablet with "Wanna F*ck" in indelible ink.

"*Plaintiff argues in his Opposition that Paragraph 22 of the Settlement Agreement may have "accidentally" superseded the provision contained in the parties' earlier partial settlement in which USC agreed not to "release or disclose Isaacs' disciplinary records to any third party" in exchange for the Plaintiff's dismissal of the Individual Defendants from the lawsuit. Paragraph 22 makes clear, however, that the Settlement Agreement supersedes prior agreements reached on the "subject matter" covered in the Settlement Agreement. The current "global" Settlement Agreement does not deal with nor address sealing of disclosing Plaintiff's disciplinary records, and therefore has no effect on the prior partial settlement*" (06-cv-3338-GAF Docket #80 p.10)

Hence, Judge Feess never touched or ruled upon the first settlement agreement and its modification of the disciplinary academic records. USC's pleading was clear that the subject matter of "sealing the disciplinary records" had nothing to do with that motion. For this reason, and the fact this Court denied discovery into these matters, the benefit assigned to Isaacs in the first settlement agreement remains unadjudicated and/or in conflict amongst competent authorities. For USC to suggest they prevailed on this matter – without any discovery – is disingenuous.

Isaacs had every right to attempt to enforce both the settlement agreements by filing this lawsuit. USC does not deny that they withheld the AAMC profile from discovery. Three independent law firms brought this case believed equitable estoppel should apply. While this Court did not elaborate upon why it chose not to estop the statute of limitations, that is far from reason to award attorneys' fees. USC has unclean hands; they never honored the settlement agreement. They refuse to answer what consideration Isaacs achieved. They state it did not "acquit" him, when it did. To suggest they prevailed on the contract claim here under Section 1717 is simply not the case. Second, even Defendants concede that California Code 1717 precludes fees for the dismissed claims: "*where an action has been voluntarily dismissed . . . there shall be no prevailing party for purposes of this section*." Furthermore, USC's attempt to frame this case as litigating pre-settlement activity is patently false. Plaintiff has been clear in the injunction and all other pleadings that should the court declare no consideration existed in the settlements, i.e. they were subject to rescission, only then would he reopen pre-2008 claims. The

argument that Plaintiff provided some background reference in his federal court pleadings in not compelling; in fact, it is the same (but incorrectly applied) first amendment litigation right Defendants purport to rely upon in their Anti-SLAPP claim. This case did not re-litigate pre-settlement claims (although that action is pending shortly), and seeking a quarter million dollars in attorneys' fees[5] suggesting otherwise is abuse of process.

In addition to being morally wrong and ill-intended, Gibson Dunn's motion fails for other reasons. The pending motion is in defiance of this Court's order to limit the fees request to 425.16, which would amount to $5,092 .

USC and GD are merely hoping this Court will rubber stamp their inhumane treatment of Dr. Isaacs in the false light of litigation First Amendment privilege. But it is Dr Isaacs with the First Amendment right to assemble at USC public facilities. The Court, *sua sponte* raises an argument never raised by USC: That as a private school, they can ban whomever they choose. But this is not correct; Supreme Court holdings cited earlier in the docket make clear that public access facilities such as hospitals, sporting venues, etc operated by USC cannot deprive Dr. Isaacs access without due process. The defendants have never proffered any semblance of due process; James Fogelman's doomed unilateral decision to ban Isaacs from USC campus does not represent due process. In short, USC does not deserve the $5,092 of time spent on their Anti-SLAPP motion according to their affidavit. The campus ban was retaliatory and inappropriate. USC uses an opportunity where they are awarded arguably $5,092 in fees to attempt to collect a quarter of a million dollars from a Doctor who cannot practice because of an agreement drafted by their counsel; this is an act of continued bullying by USC.

## II.     BACKGROUND AND PROCEDURAL HISTORY

---

[5] Time and time again, USC argued that Plaintiff's claims were non-sensical and rambling. USC replaced a small local firm , Dal Soglio Marten, with Gibson Dunn on this case last year - the top litigation firm in Los Angeles - and spent a quarter million dollars on the claim. Plaintiff's position is that USC's is politically retaliating against Isaacs for a related colleague's termination from the World Bank presidency. This abuse of process will be investigated and reported to authorities.

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

014

## III.  LEGAL STANDARD

Under Cal. Civ. Pro. § 425.16(c)(1): "in any action subject to subdivision (b), a prevailing defendant on a special motion to strike shall be entitled to recover his or her attorney's fees and costs." "Where a complaint contains both anti-SLAPP claims and non-anti-SLAPP causes  of action e.g., federal claims, the SLAPP claims alone may be stricken and a motion to dismiss may be directed to the non-SLAPP causes of action. Kearney v. Foley and Lardner, 553 F. Supp. 2d 1178, (SD Cal 2008) (citations omitted). The Courts have found fees beyond those necessary for the party to prevail on the anti-SLAPP motions when "all of the plaintiffs' claims involve a common core of facts and are based on related legal theories." Id.

## IV.  ARGUMENT

### A. Section 6 of the Agreement Does Not Apply To The Awarded Fees

USC, in an attempt to extend their fee award beyond the fees permissible under Cal. Civ. Pro. §425.16(c)(1) rely on the Attorney's fees permissible under the contractual agreement between the parties which states the following:

"With the exception of United States District Court Case No. CV-06-3338 GAF (Ex), which is fully and finally settled herein, [Plaintiff] represents that he has not filed any other lawsuits, charges, claims for arbitration, complaints, or appeals of any kind with any court or administrative or governmental agency against USC or any other persons or entities released herein, and he agrees that he will not file any lawsuits, charges or complaints or appeals at any time hereafter based on, referring to, or **incorporating any events, acts or omissions through and including the date hereof.**" USC in a creative and misguided interpretation of this contract section are asking for fees that the Court did not award. Additionally it is important to note that USC has not come to this contractual dispute with clean hands, the court has not ordered as to whether the contract has been breached by USC but would

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

015

need to do so if USC was to collect their fees under this theory. In equity it is inappropriate to order USC's fees under an order that does not address the issue of their breach of that contract.

Preliminarily this argument suffers from the same maladies as the award of fees under Cal. Civ. Pro. §425.16(c)(1) which is that USC has filed affidavits and fees unrelated to any argument made related to claims that reference actions before the contracts were entered in to. Additionally because the Court's order orders fees for the anti- SLAPP motions only the Court has not delineated which causes were dismissed because of the contract and which causes were dismissed unrelated to the contract. The language in this Court's order gives no clarity here. "As relevant here, in those agreements Plaintiff waived all claims against USC **predating** the settlements. Plaintiff then tried to avoid the settlements, but their validity was finally adjudicated against Plaintiff in 2008. Therefore, Plaintiff cannot challenge the enforceability of the settlements because of res judicates and his claims against USC for acts prior to 2008 are barred by the waivers in those settlement agreements."

It is disputed that any claims made in this complaint predate the contract between the parties. The Court indicates that "Some claims include alleged disclosures by USC in violation of various agreements between the parties." In fact, all of the Plaintiffs causes of action can be traced to post contract behavior of the parties, which moots the Defendant's argument. Without discovery it would be impossible to determine what acts predate the agreements, two distinct agreements issued one year apart, and which do not. The Defendant's theory that all of the claims brought forth in this matter predate that contract is not found on the record or in this Court's order.

**B. USC Is Not Entitled to Fees and Costs Because They Did Not Prevail On The Contract**

a. The Instant Action

It is of note that USC does not address whether the claims on which they prevailed were related to acts that occurred before the 2008 contract was signed or after, this is because the record in this case

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

does not allow for such a determination. Any argument regarding this issue should have been made with particularity. What if any of their fees they allege occurred due to the defense of claims related to acts that occurred before the contract was signed is a mystery not clarified by the present pleading.

Cal. Civ. Code §1717(a) provides: "In any action on a contract, whether the contract specifically provides that attorney's fees and costs, which are incurred to *enforce that contact*, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract whether he or she is the party specified in the contract or not, shall be entitled to reasonable attorney's fees.

It would be unjust and unreasonable for USC to breach the contract, and then be protected because the court determined that the statute of limitations ran on that breach and then for them to recover fees because they prevailed regarding the contract they are alleged to have breached. Such a finding would encourage parties to hide a breach of contract for as long as possible. Again the Defendants seem to ignore this Court's order, which dismisses the Plaintiff's contract claims on Statute of Limitation grounds not contractual ones.

Plaintiff notes that his requests relate to acts taken after the settlement agreement was signed, in fact the amended complaint was filed due to the discovery of the wonton disclosure of Dr. Isaacs' attendance at USC Keck contrary to the parties agreement. Dr. Isaacs makes it abundantly clear that his amendment was due to the discovery that USC was publishing his attendance publicly since the agreement was executed. These claims were dismissed on statute of limitations grounds, ignoring equitable estoppel arguments, and not due to a determination that the contract was not breached. USC's unclean hands when it comes to the contract at issue must be addressed before the Court enters the requested fees.

    b. Prior Action

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

This argument is especially clear when it comes to the prior action. At the point that action was dismissed the only causes of action against USC were the RICO matter and the request for injunctive relief. By its nature, a request for injunctive relief cannot, and here does not, reflect the actions of USC prior to the contractual formation. It merely requests acts in the future.

Additionally, the RICO claim in the prior action complaint referenced pre settlement acts of the Defendant only for background, focusing on the dissemination of information by "Jane and John Doe" after the parties agreed Dr. Isaacs' time at USC would not be disclosed. USC has failed to present any argument by which the contract between the parties would entitle them to the fees they seek here for their defense of the first action.

c. Conclusion

USC has failed to make any argument that would entitle them to relief under the contract. The claims brought against USC in both actions were related to their behavior after the contract was signed. USC was not a prevailing party when it came to the enforcement of that agreement. There is no argument that would entitle USC to $182,925.97 in fees and $1,009.32 in costs under the contractual attorneys between the parties.

## C. The Defendants Should Not Be Awarded Fees Under Federal Rule of Civil Procedure 41(d)

The Plaintiff was *pro se* during the entirety of the previous action. Although Dr. Isaacs is a more sophisticated litigant then most pro se parties he can hardly be expected to defend his case against a firm with the resources of Gibson Dunn without making some errors. Additionally, his first complaint was filed before he received the additional discovery which made it clear that USC was publishing his attendance and that was likely how his attendance there was being discovered. All of his pleadings, most notably the motion for preliminary injunction, were absolutely clear that he sought declaratory judgment for or against rescission, *before* he would contemplate re-opening pre-Settlement claims.

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

018

1  Particularly with regards to that issue, USC should not be able to recoup their fees. The reason
2  for that amendment was that USC had failed to provide Dr. Isaacs with the evidence that was in his file
3  there. USC did not dispute they withheld critical evidence from federal discovery production. The
4  complaint was amended due to additional information being discovered of illegal evidence spoliation.
5  The AAMC profile was not in a 2007 student record discovery production, but it mysteriously appeared
6  years later in an identical student record request. The Court should not let USC off the hook so easily,
7  
8  denying even discovery into the matter.

9  Dr. Isaacs prior action was superseded not because he was being vexatious or because he was
10 forum shopping (he refiled his compliant in the same court). It occurred because 1. Dr. Isaacs
11 discovered new evidence after he filed his first complaint, 2. Because Dr. Isaacs was unable to find
12 counsel to defend his case for some time and 3. Because the facts that give rise to Dr. Isaacs complaint
13 
14 are by their nature difficult to ascertain.

15 In addition, USC references a useful chart which makes clear that the time and energy put in to
16 defending the first case was useful in their defense of this case. It would be inequitable to award USC's
17 fees for defending the prior case when that time and effort improved their ability to defend the current
18 case. *See.* Esquivel v. Arau, 913 F.Supp 1382 (Dist. CD Cal 1996) (finding a court should not award
19 
20 costs under Rule 41(d) for costs associated with past work that will still be useful to the defendants in
21 the present litigation).

22 In LegalForce, Inc. v. LegalZoom.com, Inc., a 2019 the Northern District of California applied
23 
24 the 'American Rule' to a request for fees under Rule 41(d), which states that "attorney's fees are not
25 generally a recoverable cost of litigation." Case No. 18-cv-07274-MMC (Dist. N.D. Cal. 2019).
26 recognizing that "an exception to American Rule exists where the underlying statute defines costs to
27 include attorney's fees." Id. *citing.* Esposito v. Piatrowski, 223 F.3d 497 (7th Cir. 2000). The Court
28 

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

019

goes on to hold that Rule 41(d) does not specifically allow for collection of attorney's fees and therefore that LegalZoom cannot collect its attorneys fees under the statute. Id. The conclusion of the Northern District is that Attorneys fees are not collectable under Rule 41(d) that holding should be persuasive on this Court and the decision should be consistent with that Courts.

This request for fees is unapologetically unfair. To task a *pro se* litigant with defending his case against such a sophisticated law firm and to have the cost of his inability to do so in the six figure range is unreasonable and unjust. For the record, it is believed Isaacs did meritoriously prosecute his claims, and the Ninth Circuit will find the same.

It is also of note that USC raised this request for fees previously in this matter. The Court did not grant that request in its final order, narrowly awarding fees for the anti- SLAPP motions. If USC was requesting the court reconsider that decision it should have expressly said so in its motion. USC has failed to follow the Court procedure for doing so, they have not requested a meet and confer on this issue, nor have they plead or met the standard for reconsideration. Due to these failures and because of the unjust nature of the requested order USC's request for fees must be denied.

### D. USC is Not Entitled to the Fees and Costs It Incurred on All Claims

This issue is discussed above under subsection B, in fact this section appears to be a rehashing of the same argument addressed above. As discussed above Section 1717(a) applies when a party has incurred fees to enforce a contract. The fact that this provision is to be construed liberally does not put USC any closer to its goal of collecting fees for this victory which as discussed above was not regarding the interpretation of the contract but instead was due to an argument regarding statute of limitations.

If USC would like to waive the statute of limitation argument and move to the interpretation of the contract, specifically to resolve the question as to whether they were in breach, the Plaintiff would be happy to do so. But as the record currently stands, USC did not win on their interpretation of the

020

contract they received an order which indicated that the statute of limitations prevents the court from looking in to whether they breached their contract with Dr. Isaacs.

It would be unjust and against the statute to order fees under these circumstances. To do so would open litigants to liability for fees when they request the court interpret contractual provisions that they are correct about, when those claims are barred under procedural rules.

Section 1717(a) includes the phrase "incurred to enforce the contract" to prevent the very result that USC is now requesting. USC did not incur these fees because it did not breach the contract under the court's interpretation of the statute, rather because any alleged breach arguably occurred more than four years ago and outside the realm of equitable estoppel. To award USC such a large request for legal fees without reaching the underlying question of whose interpretation of the contract is correct is unjust and runs afoul of the statute.

### E. The Fees Incurred by USC Are Not Reasonable, Nor is This Request Clear

Putting the cart before the horse, USC has not delineated what fees they are seeking under their myriad of arguments. Making this section of their motion difficult, if not impossible to respond to. It bears repeating that the Court's order was for limited fees for the drafting and defense of USC's anti SLAPP motion and for that nearly $200,000 is clearly unreasonable, and not supported by the record.

Plaintiff agrees that the "lodestar" method is the correct method for calculating fees but what has been requested and provided does not delineate what fees are recoverable under which argument. This request therefore serves to mask the arguable reasonableness of the requested fee award under each theory, making the full request unreasonable.

USC also fails to provide evidence that these legal fees have been paid to their counsel for these activities, which must be documented in full in order to recuperate their fees. *See.* Ketchum v. Moses,

1   24 Cal. 4th 1122, 1131-33, 1141 (2001). The starting point for analyzing the reasonableness of
2   attorney's fees and costs is a determination of the actual fees and costs incurred. Id.

3       In order to reach a determination on the reasonableness of fees Plaintiff requests a full
4   evidentiary hearing so that it can be parsed out on the record which fees apply to which legal theory,
5   whether those fees were actually paid and what each time entry is in reference to. Without such a
6   hearing any award of fees is wholly unreasonable.
7

8   **V.   CONCLUSION**

9       By this outrageous request for nearly a quarter of a million dollars in legal fees USC has taken
10  this Court's narrow order on fees for their anti SLAPP motion and expanded it without authority or
11  right. By doing so they have made arguments that were not taken up by this court in its final order, and
12  not supported by it.
13

14      USC presents by their motion a number of theories as to why they are entitled to all of their
15  legal fees, none of which are related to the fees actually awarded by the court. USC has unclean hands
16  when it comes to the contract they are attempting to enforce and therefore should not be granted any
17  fees under the presented theories. On February 3, 2020 this Court entered in to a Final Order in this
18  matter. The order indicates the following request of the Court: "The Court will enter judgment in favor
19  of the Defendants without further delay. USC and Gibson Dunn may file a motion for a determination
20  of reasonable attorney's fees **under § 425.16** no later than February 24, 2020." The Court's request for
21  a motion was clear, that a motion for fees should be limited to those available under Cal. Civ. Pro §
22  425.16. Instead of filing a request for those fees USC takes the unreasonable tact of attempting to warp
23  this Court's order to create a finding for Attorney's fees that was not granted by the Court. USC's
24  motion requests all of the fees that they incurred in both this and a previous action, well beyond the
25  fees that were ordered by the Court here.
26
27
28

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

022

1   Dr. Isaacs made a claim that USC breached their contract with him. The Court did not order

2   that the contract was not breached by USC but instead found that he had missed his window to sue

3   USC on this issue and dismissed his claim under the relevant statute of limitations. In light of that

4   procedural dismissal USC inexplicably takes the opportunity to attempt to collect legal fees from Dr.

5   Isaacs. This type of unilateral expansion of court orders cannot stand. Dr. Isaacs is being abused by

6   
7   USC by this unreasonable and unlawful request.

8   Dr. Isaacs requested from this court an interpretation of the contract he signed with USC, he

9   did not receive one, but neither did USC. These are ongoing matters, and likely to be adjudicated in the

10  future. The parties were informed that the Court would not hear these arguments because statute of

11  
12  limitations purportedly expired. Dr. Isaacs maintains that USC breached this contract causing him years

13  of intense stress and aggravation and effectively destroying his medical career. To have that very entity

14  request close to a quarter of a million dollars in legal fees claiming that they won the contractual

15  interpretation issue when his case was dismissed on statute of limitations grounds is unconscionable.

16  
17  It is bad enough that Dr. Isaacs has not received the benefit of his bargain with USC, and has been

18  prevented from seeking justice for their failures under the contract because of the timing of this

19  litigation, that he be expected to pay fees for the full extent of the litigation is against the interest of

20  justice.

21  The Court correctly notes that Dr. Isaacs has spent a large amount of his life litigating these

22  
23  issues. It is unfortunate that a statute of limitations issue prevents him from pursuing them further but

24  he should not be expected to pay such a large fee award because his argument on that issue did not get

25  considered in discovery under equitable estoppel theory.

26  The fees motion before this court is a continuation of the abusive litigation conduct that USC

27  has targeted at Dr. Jeffrey Isaacs throughout this case. USC requested fees under a myriad of theories

28  

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

023

throughout this litigation, the only fees that were ordered were under Cal. Civ. Pro. § 425.16, this motion requests a reconsideration of the final order, not the enforcement of it.

Given that USC missed the deadline to file for fees under Cal. Civ. Pro § 425.16, and miraculously have failed to delineate those fees that would be recoverable under the statute in their motion, they have waived their request for those fees. Additionally, their request for all of their legal fees should be dismissed because of *res judicata* and because their legal arguments for those fees fail. Judge Feess never touched or ruled upon the meaning of sealed records, i.e. the individual settlement agreement. Isaacs provided substantial evidence that warranted discovery into USC's academic records modification policy. Even absent discovery, he should have prevailed as the first settlement agreement was a "clean" negotiation and clearly intended to let Isaacs move on with his medical career. USC didn't prevail on this contract dispute. They've just confused about a dozen separate venues on an area of little legal precedent- sealed academic records.

Not only is their motion not appropriate given the final order of this Court it also serves to obfuscate the issue that should be before this court, how much of USC's fees were spent on their anti-SLAPP motion. By failing to request those fees when asked USC has waived its request for those fees and should therefore be awarded no attorney's fees under the final order. Moreover, in light of the national emergency, the Court should adjudicate as a matter of first impression that Dr. Isaacs' academic record is sealed and expunged, and thereby issue a court order restraining and enjoining any entity from interfering with his right to volunteer immediately on the basis of academic disciplinary credentials.

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

024

Respectfully submitted, this 7th day of April, 2020.

/s/ Keith Mathews
Keith Mathews, Esq.
NH Bar No. 20997
Associated Attorneys of New England
PO Box 278
Manchester, NH 03105
Ph. 603-622-8100
keith@aaone.law

## CERTIFICATE OF SERVICE

I, Keith Mathews, do declare as follows:

I certify that a copy of the foregoing was delivered electronically to counsel for the Defendants with counsel, and emailed to those without known counsel.

Executed on this 7th day of April 2020

/s/ Keith Mathews
Keith Mathews
Attorney for Plaintiff

Isaacs v. Keck USC et al
Case No. 19-CV-08000-DSF

025

1  James P. Fogelman, SBN 161584
   Shannon E. Mader, SBN 235271
2  Katarzyna Ryzewska, SBN 300386
   GIBSON, DUNN & CRUTCHER LLP
3  333 South Grand Avenue
     Los Angeles, California 90071-3197
4  Telephone: (213) 229-7000
     Facsimile: (213) 229-7520
5  JFogelman@gibsondunn.com
   SMader@gibsondunn.com
6  KRyzewska@gibsondunn.com

7  Attorneys for Defendant
   USC Keck School of Medicine
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11 DR. JEFFREY ISAACS,                    CASE NO. 2:19-CV-08000-DSF-RAO

12              Plaintiff,                **DEFENDANT USC KECK SCHOOL
                                          OF MEDICINE'S NOTICE OF
13       v.                               MOTION AND MOTION FOR
                                          ATTORNEYS' FEES AND COSTS**
14 USC KECK SCHOOL OF MEDICINE.
   GIESEL SCHOOL OF MEDICINE AT           [Declarations of James P. Fogelman,
15 DARTMOUTH, DARTMOUTH                    Shannon Mader, and Katarzyna Ryzewska
   HITCHCOCK MEDICAL CENTER,              and Proposed Order Filed Concurrently
16 NH BOARD OF MEDICINE, GIBSON,          herewith]
   DUNN & CRUTCHER, LLP and JOHN
17 or JANE DOE,                           **Hearing**
                                          Date:      March 30, 2020
18              Defendants.               Time:      1:30 PM
                                          Location:  Courtroom 7D
19                                        Judge:     Hon. Dale S. Fischer

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP
            DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS'
                                              FEES AND COSTS

1  **TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2      **PLEASE TAKE NOTICE** that on March 30, 2020, at 1:30 p.m. in Courtroom

3  7D of the United States District Court for the Central District of California at First Street

4  Courthouse, 350 West 1st Street, Los Angeles, California Defendant USC Keck School

5  of Medicine ("USC") will and hereby does move this Court, pursuant to Rules 41(d) and

6  54(d)(2) of the Federal Rules of Civil Procedure, Central District of California Local

7  Rules 54-2 and 54-7, and California Civil Code § 1717, to recover the attorney's fees

8  and costs it incurred in successfully defending against Plaintiff's claims in the instant

9  action and the prior action that he filed and dismissed. *Isaacs v. DHMC et al.*, No. 2:19-

10  CV-02011-DSF-RAO (C.D. Cal. 2019) ("Prior Action").

11      This Motion is made on the grounds that USC is the prevailing party in this and

12  the Prior Action, and because under a settlement agreement entered into by USC and the

13  Plaintiff, USC is entitled to recover its attorney's fees and costs in the event Plaintiff

14  files a lawsuit based on events predating the agreement.

15      This Motion is based on this Notice of Motion and Motion; the Declarations of

16  Declaration of James P. Fogelman, Shannon Mader and Katarzyna Ryzewska; the

17  complete files and records in this action; and on such further evidence and argument that

18  is presented prior to or at hearing on this matter.

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

1

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS'
FEES AND COSTS

**RELIEF SOUGHT**

USC respectfully requests that this Court award attorney's fees in the amount of $182,925.97 and costs in the amount of $1,009.32 in costs, as well as any fees and costs incurred in the preparation of this Motion.

Dated: February 18, 2020                    GIBSON, DUNN & CRUTCHER LLP


By: _____*/s/ James P. Fogelman*_____
            James P. Fogelman

Attorney for Defendant

2

028

# TABLE OF CONTENTS

|  |  |  | Page |
|---|---|---|---|
| I. | | INTRODUCTION | 1 |
| II. | | BACKGROUND AND PROCEDURAL HISTORY | 3 |
| | A. | Plaintiff Settles a Lawsuit Against USC in 2008 | 3 |
| | B. | USC Seeks to Enforce the 2008 Settlement Agreement | 4 |
| | C. | Plaintiff Files his First Lawsuit against USC in this Court | 4 |
| | D. | Plaintiff Files his Second Lawsuit against USC in this Court | 5 |
| III. | | LEGAL STANDARD | 7 |
| IV. | | ARGUMENT | 9 |
| | A. | Section 6 of the Agreement Authorizes an Award of Attorney's Fees | 9 |
| | B. | As the Prevailing Party, USC is Entitled to the Fees and Costs It Incurred | 9 |
| | | 1.   USC Is the Prevailing Party in the Instant Action | 10 |
| | | 2.   USC Is the Prevailing Party in the Prior Action | 10 |
| | C. | Federal Rule of Civil Procedure 41(d) Authorizes the Award of Fees Where a Plaintiff Re-Files His Prior Action | 12 |
| | D. | USC is Entitled to the Fees and Costs It Incurred on All Claims | 13 |
| | E. | The Fees Incurred by USC Were Reasonable | 14 |
| | | 1.   USC's Hourly Rates Are Reasonable | 14 |
| | | 2.   The Total Time USC Billed Was Reasonable | 15 |
| | | 3.   The Amount of Costs Sought by USC is Reasonable | 17 |
| V. | | CONCLUSION | 17 |

Gibson, Dunn &
Crutcher LLP

i

029

# TABLE OF AUTHORITIES

**Cases**                                                                                Page(s)

*In re Baroff,*
105 F.3d 439 (9th Cir. 1997) ......................................................................... 8

*Barrientos v. 1801–1825 Morton LLC,*
583 F.3d 1197 (9th Cir. 2009) ..................................................................... 13

*Bassam v. Bank of America,*
No. CV1500587ABFFMX, 2016 WL 6267930 (C.D. Cal. Mar. 4,
2016) ........................................................................................................... 11

*Cambridge Elecs. Corp. v. MGA Elecs., Inc.,*
2005 WL 927179 (C.D. Cal. Jan. 18, 2005) ............................................... 14

*Canal v. Dann,*
2011 WL 3903166 (N.D. Cal. Sept. 6, 2011) .............................................. 16

*Catello v. I.T.T. General Controls,*
152 Cal. App. 3d 1009 (1984) ..................................................................... 11

*Caudle v. Bristow Optical Co.,*
224 F.3d 1014 (9th Cir. 2000) ..................................................................... 14

*DuFour v. Allen,*
No. 14-CV-05616-CAS(SSX), 2017 WL 1433303 (C.D. Cal. Apr. 20,
2017) ............................................................................................................. 7

*Esquivel v. Arau,*
913 F. Supp. 1382 (C.D. Cal. 1996) ............................................................ 12

*Farmers Ins. Exch. v. Law Offices of Conrado Joe Sayas, Jr.,*
250 F.3d 1234 (9th Cir. 2001) ....................................................................... 7

*Fischer v. Zespri Int'l Ltd.,*
No. 207CV5729ODWCTX, 2014 WL 12807761 (C.D. Cal. Jan. 31,
2014) ........................................................................................................... 16

*G&G Fire Sprinkler, Inc. v. Bradshaw,*
136 F.3d 587 (9th Cir. 1998) ....................................................................... 14

*Hadley v. Krepel,*
167 Cal. App. 3d 677 (1985) ................................................................. 14, 15

ii

# TABLE OF AUTHORITIES
*(continued)*

Page(s)

*Housing Rights Ctr. v. Sterling,*
2005 WL 3320738 (C.D. Cal. Nov. 1, 2005) ............................................................. 15

*Hsu v. Abbara,*
9 Cal. 4th 863 (1995) .............................................................................................. 8, 10

*Isaacs v. Dartmouth-Hitchcock Med. Ctr.,*
No. 12-CV-040-LM, 2014 WL 1572559 (D.N.H. Apr. 18, 2014), *aff'd,*
No. 14-1544 (1st Cir. 2015) ........................................................................................ 3

*Jackson v. Homeowners Ass'n Monte Vista Estates-E.,*
93 Cal. App. 4th 773 (2001) ..................................................................................... 10

*Ketchum v. Moses,*
24 Cal. 4th 1122 (2001) ............................................................................................ 14

*Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.,*
791 F.2d 1334 (9th Cir. 1986) ................................................................................... 13

*Lerner v. Ward,*
13 Cal. App. 4th 155 (1993) ........................................................................................ 9

*Makreas v. First Nat'l Bank of N. California,*
No. 11-CV-02234-JST, 2014 WL 2582027 (N.D. Cal. June 9, 2014) ...................... 16

*Marsu, B.V. v. Walt Disney Co.,*
185 F.3d 932 (9th Cir. 1999) ....................................................................................... 9

*Metabolife Int'l v. Wornick,*
213 F. Supp. 2d 1220 (S.D. Cal. 2002) ..................................................................... 16

*Morales v. City of San Rafael,*
96 F.3d 359 (9th Cir. 1996) ....................................................................................... 14

*Oakland v. Oakland Raiders,*
203 Cal. App. 3d 78 (1988) ....................................................................................... 14

*Perkins v. Mobile Housing Bd.,*
847 F.2d 735 (11th Cir. 1988) ................................................................................... 15

*Resolution Trust Corp. v. Midwest Fed. Sav. Bank,*
36 F.3d 785 (9th Cir. 1993) ......................................................................................... 7

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS'
FEES AND COSTS

## TABLE OF AUTHORITIES
(*continued*)

*Rogers v. Wal–Mart Stores, Inc.*,                                            Page(s)
  230 F.3d 868 (6th Cir. 2000) ................................................................. 12

*In re Rossco Holdings, Inc.*,
  2014 WL 2611385 (C.D. Cal. May 30, 2014) ......................................... 8

*Santisas v. Goodin*,
  17 Cal. 4th 599 (1998) .............................................................. 8, 10, 11

*Serrano v. Priest*,
  20 Cal. 3d 25 (1977) ............................................................................ 14

*Solonin v. Metro. Life Ins. Co.*,
  No. SACV1602231AGKESX, 2018 WL 5928140 (C.D. Cal. June 18,
  2018) .................................................................................................... 16

*Sunstone Behavioral Health, Inc. v. Alameda County*,
  646 F. Supp. 2d 1206 (E.D. Cal. 2009) .................................................. 7

*Turner v. Schultz*,
  175 Cal. App. 4th 974 (2009) ............................................................... 13

*United Steelworkers of Am. v. Phelps Dodge Corp.*,
  896 F.2d 403 (9th Cir. 1990) ........................................................... 14, 15

*Welch v. Metro. Life Ins. Co.*,
  480 F.3d 942 (9th Cir. 2007) ............................................................... 14

*Windsor Pac. LLC v. Samwood Co., Inc.*,
  213 Cal.App. 4th 263 (2013) ................................................................. 7

**Statutes**

Cal. Civ. Code § 1717(a) ....................................................... 7, 9, 13

Cal. Civ. Code § 1717(b)(1) ....................................................... 8, 10

Cal. Civ. Code § 1717(b)(2) ............................................................. 10

**Rules**

Fed. R. Civ. P. 41(d) ...................................................................... 12

Fed. R. Civ. P. 54(d)(2) .................................................................... 7

iv

Gibson, Dunn &
Crutcher LLP

032

## I.    INTRODUCTION

On February 3, 2020, the Court entered an Order (the "Order") dismissing Plaintiff's claims against USC Keck School of Medicine ("USC") with prejudice and granting USC's Motion to Strike (ECF 93, at 7), and a Judgment (the "Judgment") ordering that Plaintiff take nothing, that this action be dismissed with prejudice, and that Defendants may recover their costs of suit (ECF 92). As the prevailing party, USC is entitled, pursuant to Rules 41(d) and 54(d)(2) of the Federal Rules of Civil Procedure, Central District of California Local Rules 54-2 and 54-7, and California Civil Code § 1717 ("Section 1717"), to recover the attorney's fees and costs it incurred in successfully defending against Plaintiff's claims in the instant action and the prior action that he filed and dismissed. *Isaacs v. DHMC et al.*, No. 2:19-CV-02011-DSF-RAO (C.D. Cal. 2019) (the "Prior Action").

USC is entitled to an award of its attorney's fees and costs pursuant to the express terms of a settlement agreement entered into by USC and Plaintiff on April 4, 2008 (the "Agreement"). ECF 1-2, at 35-39. Specifically, Section 6 of the Agreement states that:

> [Plaintiff] *agrees that he will not file any lawsuits, charges, complaints, or appeals at any time hereafter based on, referring to, or incorporating any events, acts or omissions through and including the date hereof.*
>
> If Issacs's representation in this paragraph prove to be false, or *if he violates the promises made in this paragraph and files a lawsuit*, charge, claim for arbitration, or appeal of any kind with any court or administrative or governmental agency *against USC or any persons or entities released herein, based on any events, acts or omissions through and including the date hereof, Isaacs will pay for all costs and losses, including actual attorneys' fees, incurred by USC in connection with said lawsuit, charge, complaint, or appeal.*

ECF 1-2, at 6 (emphases added). Under the Agreement, USC is plainly entitled to the attorney's fees and costs that it incurred in this action and the Prior Action.

1    Section 6 of the Agreement was drafted with the intention of preventing Plaintiff
2    from circumventing the Agreement's releases by filing new lawsuits based on events
3    that took place prior to the execution of the Agreement. Plaintiff breached Section 6 by
4    filing not only one but two lawsuits based on alleged events predating the Agreement.
5    That Plaintiff subsequently dismissed the Prior Action as irrelevant. By its express terms,
6    Section 6 applies to any lawsuit filed by Plaintiff based on events prior to the execution
7    of the Agreement, even if Plaintiff subsequently dismisses the lawsuit. Indeed, Plaintiff
8    dismissed the Prior Action, not because he was attempting in good faith to comply with
9    his obligations to the Agreement, but because he wanted to avoid a dispositive ruling on
10   USC's then-pending motion to dismiss. The result of Plaintiff's gamesmanship was a
11   dismissal of the Prior Action. Under Section 6, Section 1717, and Federal Rule of Civil
12   Procedure 41(d), USC is entitled to the fees and costs it incurred in the Prior Action.

13   Moreover, Section 6 permits USC to recover the fees and costs it incurred in
14   defending against all of Plaintiffs' claims. In defending itself, USC was enforcing its
15   rights under the Agreement, including its right not to be sued based on events that took
16   place prior to the Agreement. ECF 1-2, at 6 (2008 Settlement Agreement). Indeed, the
17   Court expressly held that Plaintiffs' claims were barred by the waivers in the settlement
18   agreements between Plaintiff and USC. *See* ECF 93 at 1-2. Thus, there is no basis for
19   Plaintiff to argue that USC's recovery should be limited to some claims but not others.

20   USC has incurred substantial fees and costs in defending itself against Plaintiff's
21   meritless claims, and is seeking a total of $182,925.97 in fees and $1,009.32 in costs, as
22   well as the fees incurred in connection with this Motion. This amount does not reflect
23   the significant amount of time and resources expended by Gibson, Dunn & Crutcher,
24   LLP ("Gibson Dunn"), USC's counsel of record, in defending themselves in the present
25   action. Declaration of James P. Fogelman ("Fogelman Decl."), at ¶ 6. For this reason,
26   and because the overall hours and fees incurred is reasonable, USC should be awarded
27   the full amount sought, as well as any fees and costs incurred in the preparation of this
28   Motion.

Gibson, Dunn &
Crutcher LLP

2

034

## II.   BACKGROUND AND PROCEDURAL HISTORY

### A.   Plaintiff Settles a Lawsuit Against USC in 2008

In 2005, Plaintiff enrolled at USC and was later expelled for harassing a classmate and violating a "stay-away" order. ECF 1 ¶¶ 14, 27. *See also Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 12-CV-040-LM, 2014 WL 1572559, at *2 (D.N.H. Apr. 18, 2014) (granting summary judgment against Plaintiff and deeming certain facts admitted by Plaintiff), *aff'd Isaacs v. Dartmouth-Hitchcock Med. Ctr.*, No. 14-1544, (1st Cir. 2015). In response, Plaintiff sued USC. ECF 1 ¶ 32. The lawsuit resulted in a settlement in 2008 (the "Agreement"). *Id.* ¶ 33–35; ECF 1-2 at 35 (2008 Settlement Agreement).[1] The Agreement included a release of all claims, known and unknown, against USC "from the beginning of time to the date [Plaintiff] signs [the Agreement]." ECF 1-2, at 35.[2] The Agreement also provided that Plaintiff provided for the recovery of "all costs and losses, including actual attorneys' fees," in the event Plaintiff filed another lawsuit against USC based events predating the Agreement:

> With the exception of United States District Court Case No. CV-06-3338 GAF (Ex), which is fully and finally settled herein, [Plaintiff] represents that he has not filed any other lawsuits, charges, claims for arbitration, complaints, or appeals of any kind with any court or administrative or governmental agency against USC or any other persons or entities released herein, and he *agrees that he will not file any lawsuits, charges, complaints, or appeals at any time hereafter based on, referring to, or incorporating any events, acts or omissions through and including the date hereof.*

---

[1] The parties also entered into a separate settlement agreement on August 29, 2007. ECF 1-2, at 30-33 (2007 Settlement Agreement). That agreement released all claims against a number of individual defendants, and also precluded Plaintiff from filing any lawsuits against those individuals based on, referring to, or incorporating any pre-signing events. *Id.* at 30.

[2] The Agreement expressly provided that the release would "remain effective in all respects" even if Plaintiff later "discover[ed] facts different from or in addition to those he now knows or believes to be true." ECF 1-2, at 37.

1    If Isaacs's representation in this paragraph prove to be false, or *if he violates*
2    *the promises made in this paragraph and files a lawsuit*, charge, claim for
3    arbitration, or appeal of any kind with any court or administrative or
4    governmental agency *against USC or any persons or entities released herein,*
5    *based on any events, acts or omissions through and including the date*
6    *hereof, Isaacs will pay for all costs and losses, including actual attorneys'*
7    *fees, incurred by USC in connection with said lawsuit, charge, complaint,*
8    *or appeal*. ECF 1-2, at 6 (emphases added).

9    Taken together, these provisions precluded Plaintiff from asserting *any* claims
10   against USC that referred to or incorporated, let alone were based on, events that
11   occurred prior to the execution of the Agreement, whether or not Plaintiff was aware of
12   them or subsequently discovered them.

13   **B.    USC Seeks to Enforce the 2008 Settlement Agreement**

14   Shortly after USC and Plaintiff entered into the Agreement, USC was forced to
15   file a motion to enforce the Agreement when Plaintiff refused to dismiss the action. *See*
16   ECF 45-2, Ex. 11, at 121 (Mot. to Enforce Settlement Agreement). The Court granted
17   USC's Motion, dismissing the case with prejudice, and noting that presented "no
18   grounds on which to void the [Agreement]" and that he was "bound by its terms." ECF
19   45-2, Ex. 13, at 137-40 (2008 Order).

20   **C.    Plaintiff Files his First Lawsuit against USC in this Court**

21   On March 18, 2019, Plaintiff filed the Prior Action against USC and other
22   defendants, seeking damages "in excess of $18,000,000," treble damages, injunctive
23   relief, and attorneys' fees and costs. Prior Action, ECF 1. Plaintiff attached a copy of the
24   Agreement to his Complaint. *Id.* at 39-44. The Complaint was based on, made reference
25   to, and incorporated alleged events that took place prior to the Agreement. *Id.* at 2-3, 5-
26   9, 31-32. USC filed a motion to dismiss on June 26, 2019. Prior Action, ECF 14.

27   On July 19, 2019, rather than oppose USC's motion to dismiss, Plaintiff filed his
28   First Amended Complaint ("FAC"). Far from curing the defects in his Complaint,

Gibson, Dunn &
Crutcher LLP

4

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS'
FEES AND COSTS

1　however, Plaintiff added *seven* new claims against USC, including declaratory
2　judgment, breach of contract, intentional infliction of emotional distress, negligent
3　infliction of emotional distress, a Bivens implied cause of action, retaliation, and
4　constructive fraud. Prior Action, ECF 33. Plaintiff continued to reference, incorporate,
5　and base his claims on alleged pre-2008 events. *Id.* at 1, 6-12, 30, 41-42, 53, 56.

6　　　Plaintiff filed a Motion for Preliminary Injunction ("PI Motion") on August 1,
7　2019. Prior Action, ECF 36. The PI Motion, like Plaintiff's complaints, referred to
8　various alleged pre-Agreement events. *Id.* at 3-4.

9　　　USC filed a motion to dismiss the FAC on August 2, 2019 and an Opposition to
10　the PI Motion on August 19, 2019. Prior Action, ECF 41, 46.

11　　　On August 26, 2019, rather than oppose USC's motion to dismiss, Plaintiff filed
12　a Second Amended Complaint ("SAC") without leave of the Court or a stipulation from
13　the parties. Prior Action, ECF 50. The Court ordered the SAC stricken on August 27,
14　2019. Prior Action, ECF 51. Instead of responding to USC's motion to dismiss, Plaintiff
15　simply refashioned his SAC as a Motion for Leave to Amend and filed it the same day
16　as the Court's order. Prior Action, ECF 52.

17　　　In the face of multiple motions to dismiss, and unwilling to wait for the Court's
18　ruling on his Motion for Leave to Amend, Plaintiff decided to dismiss the Prior Action
19　on September 12, 2019. Prior Action, ECF 60. In an abundance of caution, USC filed an
20　opposition to Plaintiff's Motion for Leave to Amend on September 13, 2019. Prior
21　Action, ECF 62. The Court later closed the case. Prior Action, ECF 60, 64, 68, 69.

22　　　The total fees incurred by USC in the Prior Action was $142.384.95. Fogelman
23　Decl., ¶ 6. The total amount of costs incurred in the Prior Action was $371.34. *Id.*

24　**D.　Plaintiff Files his Second Lawsuit against USC in this Court**

25　　　On September 16, 2019, just four days after dismissing the Prior Action, Plaintiff
26　re-filed his proposed SAC from his Complaint in this action. ECF 1, 1-1, 1-2. The
27　Complaint included not just claims against USC, but against Gibson Dunn, USC's
28　counsel of record in the Prior Action. *Id.* The Complaint added *three* new claims against

1  USC: due process and First Amendment violations, fraud, and rescission. ECF 1, at 61,
2  64; ECF 1-1, at 3. Plaintiff once again relied upon, referred to, and incorporated alleged
3  pre-Agreement events. ECF 1, at 2, 4, 5, 14-17, 25, 32, 33, 37, 44, 47, 54, 57, 62-64;
4  ECF 1-1 at 1, 4, 13-43. *See also* ECF 1-2 at 27. On September 25, 2019, Plaintiff re-
5  filed his PI Motion from the Prior Action, confirming the wholly duplicative nature of
6  this action. ECF 13. USC filed an opposition to the PI Motion on October 7, 2019 and a
7  motion to dismiss the Complaint on October 17, 2019. ECF 35; ECF 45.

8      On November 6, 2019, the Court issued an Order denying the PI Motion, stating
9  that "Plaintiff has shown no likelihood of success on the merits. Aside from the problems
10 of statute of limitations and res judicata, he has simply not demonstrated any likelihood
11 that he is correct on the merits of any of the claims in this case. Plaintiff's interpretation
12 of the settlement agreements at issue appears to be erroneous, and there is no evidence
13 that any party has violated either agreement as properly interpreted." ECF 68, at 2.

14     On December 9, 2019, Plaintiff filed a Motion for Reconsideration, or in the
15 alternative, a Stay of Proceedings ("Motion for Reconsideration"). ECF 73. On
16 December 17, 2019, the Court denied the Motion Reconsideration, holding that
17 "Plaintiff's motion for reconsideration fails to satisfy any of the criteria of Local Rule 7-
18 18," and that "[t]here are also no grounds for a stay of proceedings because Plaintiff has
19 virtually no chance of success on the merits of an appeal of the preliminary injunction
20 order." ECF 76, at 2.

21     On November 11, 2019, USC filed an anti-SLAPP motion and joinder in Gibson
22 Dunn's anti-SLAPP motion. ECF 67; ECF 67-1. USC is not seeking fees for work
23 expended by Gibson Dunn in drafting their anti-SLAPP motion, on which the USC
24 motion relied in part. Fogelman Decl., ¶ 6.

25     On February 3, 2020, the Court granted USC's motion to dismiss and anti-SLAPP
26 motion. ECF 93. The Court also entered Judgment in favor of USC, ordering that
27 Plaintiff take nothing, and dismissing all of Plaintiff's claims with prejudice. ECF 94.

28

1    The amount of fees and costs incurred by USC in the instant action total
2    $40,541.02, with $5,092.64 being attributable to the anti-SLAPP motion. Fogelman
3    Decl., ¶ 6. The total amount of costs incurred in the present action is $637.98. *Id.*

### III. LEGAL STANDARD

5    Pursuant to Federal Rule of Civil Procedure 54(d)(2), a claim for attorney's fees
6    and related nontaxable expenses must be made by a post-judgment motion. *See*
7    Fed. R. Civ. P. 54(d)(2). The motion must specify the judgment and the statute, rule, or
8    other grounds entitling the moving party to the award of fees, and must state the amount
9    sought or provide a fair estimate of it. *Id.* State law governs the interpretation of a
10   contract providing for the recovery of attorney's fees. *Resolution Trust Corp. v. Midwest*
11   *Fed. Sav. Bank*, 36 F.3d 785, 800 (9th Cir. 1993); *DuFour v. Allen*, No. 14-CV-05616-
12   CAS(SSX), 2017 WL 1433303, at *7 (C.D. Cal. Apr. 20, 2017).

13   "California Civil Code section 1717 provides for an award of attorneys' fees
14   where 'the parties contractually obligate themselves' to so compensate each other."
15   *Sunstone Behavioral Health, Inc. v. Alameda County*, 646 F. Supp. 2d 1206, 1211
16   (E.D. Cal. 2009) (quoting *Farmers Ins. Exch. v. Law Offices of Conrado Joe Sayas, Jr.*,
17   250 F.3d 1234, 1237 (9th Cir. 2001)). Specifically, § 1717(a) provides:

18       In any action on a contract, where the contract specifically provides that
19       attorney's fees and costs, which are incurred to enforce that contract, shall be
20       awarded either to one of the parties or to the prevailing party, then the party
21       who is determined to be the party prevailing on the contract, whether he or
22       she is the party specified in the contract or not, shall be entitled to reasonable
23       attorney's fees in addition to other costs.

24   Cal. Civ. Code § 1717(a). The statute provides for "mutuality of remedy [even] when a
25   contract makes recovery of attorneys' fees available only to one party." *Farmers Ins.*
26   *Exch. v. Law Offices of Conrado Joe Sayas, Jr.*, 250 F.3d 1234, 1237 (9th Cir. 2001).

27   "Whether a contractual attorney fee clause provides for a fee award in a particular
28   case is a question of contract interpretation." *Windsor Pac. LLC v. Samwood Co.*,

Gibson, Dunn &
Crutcher LLP

039

1   *Inc.*, 213 Cal.App. 4th 263, 273 (2013). "Under statutory rules of contract interpretation,
2   the mutual intention of the parties at the time the contract is formed governs
3   interpretation. Such intent is to be inferred, if possible, solely from the written provisions
4   of the contract. The clear and explicit meaning of these provisions, interpreted in their
5   ordinary and popular sense, unless used by the parties in a technical sense or a special
6   meaning is given to them by usage, controls judicial interpretation. Thus, if the meaning
7   a layperson would ascribe to contract language is not ambiguous, we apply that
8   meaning." *Santisas v. Goodin,* 17 Cal. 4th 599, 608 (1998) (internal citations and
9   quotation marks omitted).

10       The "prevailing party," for purposes of § 1717, is the "party who recovered a
11   greater relief in the action on the contract." Cal. Civ. Code § 1717(b)(1). "[I]n deciding
12   whether there is a 'party prevailing on the contract,' the trial court is to compare the
13   relief awarded on the contract claim or claims with the parties' demands on those same
14   claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening
15   statements, and similar sources." *Hsu v. Abbara*, 9 Cal. 4th 863, 876 (1995).

16       Section 1717 applies even where the action is not for breach of contract. In
17   applying § 1717, "California courts liberally construe 'on the contract' to extend to any
18   action as long as an action 'involves' a contract and one of the parties would be entitled
19   to recover attorney fees under the contract if that party prevails." *In re Rossco Holdings,*
20   *Inc.*, 2014 WL 2611385, at *7 (C.D. Cal. May 30, 2014) (quoting *In re Baroff*, 105 F.3d
21   439, 442–443 (9th Cir. 1997)). For instance, in *Rossco*, claims for declaratory relief,
22   damages, and injunctive relief in a bankruptcy proceeding were deemed to be actions
23   "on the contract" because "the 'fight' between the parties was based on their 2010
24   Agreement" and "[m]ore importantly, in order to resolve that dispute, the Bankruptcy
25   Court found that it was required to interpret the 2010 Agreement." *Id.* at *6–7. Thus,
26   under *Rossco*, the relevant question is whether the claims in the underlying matter "turn
27   upon interpreting a contract." *Id.* at *3.

28

1   Actions sounding in fraud trigger the right to recover attorney's fees if the
2   contractual provision is broadly worded to encompass tort claims. For example, in
3   *Marsu, B.V. v. Walt Disney Co.*, 185 F.3d 932, 939 (9th Cir. 1999), the Ninth Circuit
4   affirmed an award of attorney's fees for tort claims where the contract provided that
5   "*[a]ny dispute, difference, claim or counterclaim between the parties arising out of or*
6   *in connection with this agreement* shall be submitted to state or federal court. . . . The
7   prevailing party in *any action* hereunder shall be entitled to recover . . . reasonable
8   attorneys' fees." *Id.* (emphases in original). The Ninth Circuit held that the provision
9   applied to the plaintiff's tort claims because they arose "out of or in connection with"
10  the contract. *Id.* (citing *Lerner v. Ward*, 13 Cal. App. 4th 155, 160 (1993) (attorney's
11  fees provision for claims "arising out of this Agreement" includes tort claims)).

12  ## IV.   ARGUMENT

13  ### A.   Section 6 of the Agreement Authorizes an Award of Attorney's Fees

14  Section 1717 authorizes an award of attorney's fees where the parties' contract
15  provides for such recovery. Cal. Civ. Code § 1717(a). Here, Section 6 of the Agreement
16  plainly authorizes such an award. Section 6 provides for the recovery of "***all costs and***
17  ***losses, including actual attorneys' fees***, incurred by USC" where Plaintiff files a lawsuit
18  "based on, referring to, or incorporating" alleged "events, acts or omissions" that
19  predated the execution of the Agreement. ECF 1-2, at 6 (emphasis added). As set forth
20  above, Plaintiff's complaints in both this action and the Prior Action referenced were
21  based on pre-2008 events, acts, and omissions. *See*, *supra*, Section (II)(C). Accordingly,
22  Section 6 authorizes an award of attorney's fees and costs.[3]

23  ### B.   As the Prevailing Party, USC is Entitled to the Fees and Costs It Incurred

24

25  [3] In addition to being entitled to fees under the Agreement, USC is also entitled to an
    award of reasonable attorneys' fees pursuant to Code of Civil Procedure §
26  425.16(c)(1) because it successfully moved to strike Plaintiff's claims. ECF 93 at 7.
    USC incurred, and is requesting an award of $5,092.64 in fees for 6.2 hours of
27  work directly related to the filing of the anti-SLAPP motion. This total reflects the
    time spent drafting the motion and meeting and conferring with Plaintiff. ECF 67;
28  Fogelman Decl., Ex. A at 7-8. The entries related to the anti-SLAPP motion are
    highlighted in blue in USC's fee summary. *Id.*
                                    9

Gibson, Dunn &
Crutcher LLP

041

1         Under Section 1717, the "prevailing party" is the "party who recovered a greater

2 relief in the action on the contract." Cal. Civ. Code § 1717(b)(1). Here, there can be no

3 question that USC was the prevailing party in this action and the Prior Action. Plaintiff

4 sought in over $18,000,000 in both actions but took nothing, because he voluntarily

5 dismissed the Prior Action and because all of his claims in this action were dismissed

6 with prejudice. Prior Action, ECF 1; ECF 1-1; ECF 94. Thus, as the prevailing party,

7 USC is entitled to recover the fees and costs incurred in this action and the Prior Action.

8            **1.**     **USC Is the Prevailing Party in the Instant Action**

9         In determining the prevailing party, courts compare the relief awarded with the

10 parties' "litigation objectives as disclosed by the pleadings, trial briefs, opening

11 statements, and similar sources." *Hsu*, 9 Cal. 4th at 876. Here, Plaintiff was seeking to

12 recover more than $18,500,000 in damages, treble damages, his attorney's fees and

13 costs, and injunctive relief. ECF 1-1, at 5. He achieved *none* of these objectives. The

14 Court denied Plaintiff's motion for a preliminary injunction and dismissed his claims

15 with prejudice. ECF 68; ECF 93; ECF 94. By contrast, the Court granted USC's motion

16 to dismiss and anti-SLAPP motion and declined to enter an injunction. ECF 93; ECF 94.

17 Plainly, USC is the prevailing party in this action.

18            **2.**     **USC Is the Prevailing Party in the Prior Action**

19         USC was also the prevailing party in the Prior Action because Plaintiff voluntarily

20 dismissed his complaint rather than oppose USC's motion to dismiss. By its terms, the

21 Agreement contemplates the recovery of fees even where Plaintiff voluntarily dismisses

22 a lawsuit, so long as the lawsuit references events prior to the execution of the

23 Agreement. Nor does Section 1717 preclude such recovery. Even though Section 1717

24 states that "[w]here an action has been voluntarily dismissed . . . there shall be no

25 prevailing party for purposes of this section," Cal. Civ. Code § 1717(b)(2), California

26 courts do not apply an inflexible rule precluding recovery where a complaint is

27 voluntarily dismissed. *See, e.g., Jackson v. Homeowners Ass'n Monte Vista Estates-E.*,

28 93 Cal. App. 4th 773, 784 (2001); *Santisas v. Goodin*, 17 Cal. 4th 599, 613 (1998).

Gibson, Dunn &
Crutcher LLP

10

042

1  Rather, courts base their "decision on a pragmatic definition of the extent to which each
2  party has realized its litigation objectives." *Santisas*, 17 Cal. 4th at 622.

3  In *Bassam v. Bank of America*, for example, the defendant sought to recover
4  attorneys' fees pursuant to a contractual provision. No. CV1500587ABFFMX, 2016 WL
5  6267930, at *2 (C.D. Cal. Mar. 4, 2016). The Court found that the defendant was the
6  prevailing party, even though the plaintiffs had voluntarily dismissed certain contract
7  claims, because they did so "*only after* filing three complaints (the FAC was filed in lieu
8  of an opposition to the first MTD), after Defendants filed three motions to dismiss—the
9  first was rendered moot by Plaintiffs' filing of the FAC, the other two were granted—
10 and after the court struck Plaintiffs' two tort claims (negligence and negligent infliction
11 of emotional distress) without leave to amend." *Id.*

12 The same logic applies here. Plaintiff voluntarily dismissed his Prior Action, not
13 because he was attempting in good faith to comply with his obligations under the
14 Agreement, but because he found that his "case was sinking, Titanic-like." *Catello v.*
15 *I.T.T. General Controls*, 152 Cal. App. 3d 1009, 1013 (1984). But he immediately filed
16 a new lawsuit based on the same claims and allegations, and every single one of those
17 claims was determined to be meritless by this Court in this instant action.

18 As a result under Section 1717 and the plain terms of the Agreement, USC is
19 entitled to an award of attorney's fees and costs for the Prior Action.[4]

20
21
22
23
────────────────
24 [4] While California public policy generally encourages voluntary dismissals, that policy
25 is subverted when a plaintiff voluntarily dismisses an action and immediately re-files
   it to avoid dismissal. Section 1717(b)(2) was enacted because "permitting recovery
   of attorney fees by defendant in all cases of voluntary dismissal before trial would
26 encourage plaintiffs to maintain pointless litigation in moot cases or against insolvent
   defendants to avoid liability for those fees." *Santisas*, 17 Cal. 4th at 613. The public
27 benefits when litigation does not drag on unnecessarily. *Id.* at 621–22. Plaintiff's
28 tactical dismissal of the Prior Action turned these policies on their head.

## C. Federal Rule of Civil Procedure 41(d) Authorizes the Award of Fees Where a Plaintiff Re-Files His Prior Action

The Federal Rules of Civil Procedure also provide for the recovery of attorneys' fees where a lawsuit is voluntarily dismissed. Federal Rule of Civil Procedure 41(d) states that "[i]f a plaintiff who previously dismissed an action in any court files an action based on or including the same claim against the same defendant, the court: (1) may order the plaintiff to pay all or part of the costs of that previous action; and (2) may stay the proceedings until the plaintiff has complied." Fed. R. Civ. P. 41(d). Rule 41(d) is "intended to serve as a deterrent to forum shopping and vexatious litigation." *Esquivel v. Arau*, 913 F. Supp. 1382, 1386 (C.D. Cal. 1996) (citation omitted); *see also Rogers v. Wal–Mart Stores, Inc.*, 230 F.3d 868, 874 (6th Cir. 2000) (stating that 41(d) is "intended to prevent attempts to gain any tactical advantage by dismissing and re-filing the suit"). Importantly, courts have held that attorneys' fees are also recoverable under Rule 41(d). *Esquivel*, 913 F. Supp. at 1392.

There is no question that Plaintiff's Complaint here includes the same claims that Plaintiff asserted against USC in the Prior Action. Plaintiff simply *added* new claims:

| Prior Action Compl. | Prior Action FAC | Prior Action SAC | Current Compl. |
|---|---|---|---|
| RICO | RICO | RICO | RICO |
| Injunctive Relief | | | |
| | Declaratory Relief | Declaratory Relief | Declaratory Relief |
| | Breach of Contract | Breach of Contract | Breach of Contract |
| | IIED | IIED | IIED |
| | NIED | NIED | NIED |
| | Bivens | Bivens | Bivens |
| | Retaliation | Retaliation | Retaliation |
| | Constructive Fraud | Constructive Fraud | Constructive Fraud |
| | | Fraud | Fraud |

12

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND COSTS

044

| | | Rescission | Rescission |
|---|---|---|---|
| | | | Due Process & First Amendment |

Prior Action, ECF 1; Prior Action, ECF 33; Prior Action 52-1; ECF 1, ECF 1-2. Thus, Rule 41(d) also provides for the recovery of USC's fees and costs in the Prior Action.

## D.   USC is Entitled to the Fees and Costs It Incurred on All Claims

USC is entitled to recover all of the fees and costs it incurred in defeating Plaintiff's claims. Section 1717(a) provides for a fees award in "any action on a contract" and "incurred to enforce that contract." Cal. Civ. Code § 1717(a).

"California courts construe the term 'on a contract' liberally." *Turner v. Schultz*, 175 Cal. App. 4th 974, 979 (2009) (citation omitted). The question of whether a dispute is "on a contract" within the meaning of section 1717 depends on whether underlying contract defines the rights and obligations of the parties involved in the proceeding in which attorney's fees are sought, such that the underlying contract is not collateral to the proceeding. *See Lafarge Conseils Et Etudes, S.A. v. Kaiser Cement & Gypsum Corp.*, 791 F.2d 1334, 1340 (9th Cir. 1986) (holding that action was "on a contract" for the purpose of awarding fees under section 1717 because "the underlying contract between the parties is not collateral to the proceedings but plays an integral part in defining the rights of the parties"); *Barrientos v. 1801–1825 Morton LLC*, 583 F.3d 1197, 1216 (9th Cir. 2009) (same).

Here, there can be no question the Agreement is integral to defining the parties' rights and obligations. By entering into the Agreement, Plaintiff not only agreed to waive all claims against USC, but also agreed not to file any lawsuits based on alleged events predating the execution of the Agreement. ECF 1-2, at 6. By filing the Prior Action and this action, Plaintiff was breaching the Agreement. As a result, the defense of every single claim was integral to the vindication of USC's rights under the Agreement.

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND COSTS

**E.  The Fees Incurred by USC Were Reasonable**

Under both Federal and California law, the starting point for analyzing the reasonableness of attorney's fees and costs is a determination of the actual fees and costs incurred. *See Ketchum v. Moses*, 24 Cal. 4th 1122, 1131–33, 1141 (2001); *see also Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1028 (9th Cir. 2000); *Serrano v. Priest*, 20 Cal. 3d 25, 49 n.23 (1977); *Oakland v. Oakland Raiders*, 203 Cal. App. 3d 78, 82–83 (1988); *Hadley v. Krepel*, 167 Cal. App. 3d 677, 685–86 (1985).

The Ninth Circuit requires a district court to calculate an award of attorney's fees by first calculating the "lodestar." *Caudle*, 224 F.3d at 1028. The lodestar is calculated by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly fee. *See Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996). "A strong presumption exists that the lodestar . . . represents a reasonable fee." *G&G Fire Sprinkler, Inc. v. Bradshaw*, 136 F.3d 587, 600 (9th Cir. 1998). "California uses the same method for calculating attorneys' fees." *Cambridge Elecs. Corp. v. MGA Elecs., Inc.*, 2005 WL 927179, at *5 (C.D. Cal. Jan. 18, 2005).

**1.  USC's Hourly Rates Are Reasonable**

USC's attorneys are entitled to be compensated at rates that reflect the reasonable value of their services. *Ketchum*, 24 Cal. 4th at 1133. Declarations regarding the rates charged by attorneys of comparable ability and reputation for legal work of similar complexity suffice to establish the reasonable hourly rate. *See Cambridge Elecs. Corp.*, 2005 WL 927179, at *5; *see also Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 946–47 (9th Cir. 2007); *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990) ("Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate."). "The relevant community is that where the district court sits." *Cambridge Elecs. Corp.*, 2005 WL 927179, at *5.

Gibson, Dunn &
Crutcher LLP

046

1    To that end, USC has submitted a copy of the Public Rates report, published by
2    Thomson Reuters, showing the prevailing rates for California attorneys. Fogelman
3    Decl., Ex. B. The Public Rates report shows that the rates charged by Gibson Dunn are
4    within the range of rates charged generally by similar firms engaged in similar work. *Id.*
5    For instance, the rates charged by Pachulski Stang Ziehl Young Jones & Weintraub in
6    the 2019 *Sedgwick LLP* matter in the Northern District are roughly equivalent to the
7    rates charged by Gibson Dunn here. *Id.* at 123. Moreover, the hourly rates charged by
8    Gibson Dunn for this matter are lower than the rates charged by the firm generally.
9    Fogelman Decl., ¶ 9. The fact that thousands of sophisticated clients are willing to, and
10   do, pay these rates on an ongoing basis is, in itself, evidence that the rates reflect the
11   reasonable value of the services rendered by Gibson Dunn. *Cf. Housing Rights Ctr. v.*
12   *Sterling*, 2005 WL 3320738, at *2 (C.D. Cal. Nov. 1, 2005) (noting, in 2005, that "rates
13   of up to $1,000 per hour" in the Los Angeles legal market are "in line with this Court's
14   experience").

### 2.    The Total Time USC Billed Was Reasonable

16   The detailed billing summary submitted by USC demonstrates that the time billed
17   by Gibson Dunn was reasonable and necessary. The billing records and the declarations
18   of James P. Fogelman, Shannon Mader, and Katarzyna Ryzewska are all *prima facie*
19   evidence that fees and costs listed were "reasonably and necessarily incurred." *Hadley*,
20   167 Cal. App. 3d at 682; *see also Perkins v. Mobile Housing Bd.*, 847 F.2d 735, 738
21   (11th Cir. 1988) (before the compensation claimed is denied, "it must appear that the
22   time claimed is obviously and convincingly excessive under the circumstances"); *United*
23   *Steelworkers*, 896 F.2d at 407 (holding that it was error for court to reduce hours claimed
24   by prevailing party without setting forth an appropriate rationale for each such
25   reduction).

26   As set forth in the billing summary and the Fogelman Declaration, the time spent
27   included: reviewing Plaintiff's voluminous filings; researching and analyzing Plaintiff's
28   claims; researching and reviewing Plaintiff's litigation history; researching and drafting

1  three motions to dismiss and an anti-SLAPP motion; researching and drafting
2  oppositions to Plaintiff's PI Motions, Motion for Leave to Amend, and Motion for
3  Reconsideration; and meeting and conferring with Plaintiff and his attorneys. Fogelman
4  Decl., ¶ 5, Ex. A. Considering the legal and factual issues involved, the total hours billed
5  by Gibson Dunn attorneys—223.3—is more than reasonable. *Id.* at ¶ 6. Importantly, the
6  total amount that USC is seeking is actually less than the total amount charged to the
7  client. *Id.* at ¶ 6, Ex. A.

8       As such, Plaintiff has no basis to challenge the appropriateness of the time billed
9  by Gibson Dunn, and therefore, USC is entitled to recover all of its fees and costs. *See,*
10  *e.g.*, *Solonin v. Metro. Life Ins. Co.*, No. SACV1602231AGKESX, 2018 WL 5928140,
11  at *4 (C.D. Cal. June 18, 2018) (awarding $140,000 in fees); *Fischer v. Zespri Int'l Ltd.*,
12  No. 207CV5729ODWCTX, 2014 WL 12807761, at *3 (C.D. Cal. Jan. 31, 2014)
13  (awarding $615,959.63 in trial court fees, $165,872.50 in appellate fees, $32,442.70 in
14  costs, $14,999.04 for temporary in-house counsel, and $32,006.70 for international local
15  counsel); *Canal v. Dann*, 2011 WL 3903166, at *4 (N.D. Cal. Sept. 6, 2011) (awarding
16  $461,297.90 in fees); *Makreas v. First Nat'l Bank of N. California*, No. 11-CV-02234-
17  JST, 2014 WL 2582027, at *6 (N.D. Cal. June 9, 2014) (awarding $312,946.50 in fees);
18  *Metabolife Int'l v. Wornick*, 213 F. Supp. 2d 1220, 1228 (S.D. Cal. 2002) (awarding
19  $318,687.99 in fees and costs).

20       An award of the full amount of USC's fees and costs is particularly appropriate
21  here, given that USC repeatedly sought to minimize their fees and costs by seeking to
22  resolve these cases on the pleadings. With each motion to dismiss, USC sought dismissal
23  with prejudice. Each time, however, Plaintiff amended his complaint, improperly
24  attempted to amend his complaint without leave of the Court, and/or voluntarily
25  dismissed his complaint to avoid a dispositive ruling. At no time did Plaintiff ever make
26  a meaningful effort to address the pleading defects identified by USC. Far from seeking
27  to minimize USC's fees and costs, Plaintiff filed a wholly frivolous PI Motion and
28  Motion for Reconsideration. Indeed, Plaintiff continued to press ahead even after the

16

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS'
FEES AND COSTS

1  Court found that that "Plaintiff has shown no likelihood of success on the merits." ECF
2  68, at 2. In short, Plaintiff is wholly responsible for the fees and costs that USC
3  incurred. Further, the total number of hours billed to USC is significantly less than the
4  total time actually spent by Gibson Dunn. Fogelman Decl., ¶ 6, Ex. A. USC is not
5  seeking fees for all work done by Gibson Dunn related to this litigation, and thus, at the
6  end of the day, Plaintiff is getting a bargain for the legal work that Gibson Dunn put into
7  defending USC.

8        **3.    The Amount of Costs Sought by USC is Reasonable**

9        USC is entitled to "***all costs and losses, including actual attorneys' fees***, incurred
10  by USC" where Plaintiff files a lawsuit "based on, referring to, or incorporating" alleged
11  "events, acts or omissions" that predated the execution of the Agreement. ECF 1-2, at 6
12  (emphasis added). USC is seeking $273.33 ($168.80 for the Prior Action and $104.53
13  for the present action) in costs related to the delivery of mandatory chamber copies per
14  the Court's Standing Order, Section 3(b), which are recoverable under the Agreement
15  and Local Rule 54-3.10. Additionally, USC requests an award of $735.99 ($202.54 for
16  the Prior Action and $533.45 for the present action) related to the filings conducted by
17  Gibson Dunn's e-filing vendor, First Legal, Pacer charges, in-house duplication, or
18  research, which are recoverable under the Agreement. A breakdown of these costs is
19  submitted as part of Exhibit A. Fogelman Decl., Ex. A, at 9-13.

20                      **V.    CONCLUSION**

21        Accordingly, and for the reasons set forth above, USC respectfully requests that
22  this Court, pursuant to Rules 41(d) and 54(d)(2) of the Federal Rules of Civil Procedure,
23  Central District of California Local Rules 54-2 and 54-7, and California Civil Code
24  § 1717, award it the amount of $182,925.97 in attorneys' fees and $1,009.32 in costs,
25  and any fees and costs incurred in the preparation of this Motion.

26

27  Dated: February 18, 2020           GIBSON, DUNN & CRUTCHER LLP

28

Gibson, Dunn &
Crutcher LLP

                              17

1

By: _____ /s/ James P. Fogelman
           James P. Fogelman

2

3
Attorney for USC Keck School of
Medicine

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

18

DEFENDANT USC KECK SCHOOL OF MEDICINE'S NOTICE OF MOTION AND MOTION FOR ATTORNEYS'
FEES AND COSTS

1  James P. Fogelman, SBN 161584
   Shannon E. Mader, SBN 235271
2  Katarzyna Ryzewska, SBN 300386
   GIBSON, DUNN & CRUTCHER LLP
3  333 South Grand Avenue
   Los Angeles, California 90071-3197
4  Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
5  JFogelman@gibsondunn.com
   SMader@gibsondunn.com
6  KRyzewska@gibsondunn.com

7  Attorneys for Defendant
   USC Keck School of Medicine
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

11 DR. JEFFREY ISAACS,                 CASE NO. 2:19-CV-08000-DSF-RAO

12            Plaintiff,               **DECLARATION OF JAMES P.
                                       FOGELMAN IN SUPPORT OF**
13     v.                              **DEFENDANT USC KECK SCHOOL
                                       OF MEDICINE'S MOTION FOR**
14 USC KECK SCHOOL OF MEDICINE.        **ATTORNEYS' FEES AND COSTS**
   GIESEL SCHOOL OF MEDICINE AT
15 DARTMOUTH, DARTMOUTH                [Defendant's Notice of Motion and Motion
   HITCHCOCK MEDICAL CENTER,           for Attorneys' Fees and Cots, Declarations
16 NH BOARD OF MEDICINE, GIBSON,       of Shannon Mader and Katarzyna
   DUNN & CRUTCHER, LLP and JOHN       Ryzewska, and Proposed Order Filed
17 or JANE DOE,                        Concurrently herewith]

18            Defendants.              **Hearing**
                                       Date:      March 30, 2020
19                                     Time:      1:30 PM
                                       Location:  Courtroom 7D
20                                     Judge:     Hon. Dale S. Fischer

21
22
23
24
25
26
27
28

Gibson, Dunn &
Crutcher LLP
       DECLARATION OF JAMES P. FOGELMAN IN SUPPORT OF DEFENDANT USC KECK SCHOOL OF
                      MEDICINE'S MOTION FOR ATTORNEYS' FEES AND COSTS

# DECLARATION OF JAMES P. FOGELMAN

I, James P. Fogelman, declare:

1.    I am an attorney duly licensed to practice before this Court. I am partner with the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), and I am one of the attorneys of record for USC Keck School of Medicine ("USC") in this action. I am submitting this declaration in support of USC's Motion Attorneys' Fees and Costs. I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify hereto.

2.    I graduated from the Wharton School of Economics at the University of Pennsylvania in 1989 and from the UCLA School of Law in 1992. I was admitted to practice in the state and federal courts in California in 1992. I am also admitted to practice law in Nevada, Washington, D.C., and New York. I have been an attorney with Gibson Dunn since 1992, and have been a partner with the firm since 2002. I am also Co-Chair of Gibson Dunn's Law Firm Defense Practice Group. Over my quarter-century of practice, I have developed expertise in representing clients in sports litigation, fantasy sports litigation, gaming and casino litigation, entertainment litigation, real estate litigation, and law firm defense litigation. My 2019 standard hourly billing rate was $1,265/hour. My 2020 standard hourly billing rate is $1,350/hour.

3.    Gibson Dunn is an international law firm with over 1,200 attorneys in 20 offices worldwide. The firm was named Litigation Department of the Year by The American Lawyer in 2010, 2012, 2016, and 2019.

4.    I reviewed all of Gibson Dunn bills related to this matter. In recording their time, attorneys at Gibson Dunn are required to specify the client and matter number, the nature of the work performed, and the amount of time expended on that task, and the bills reflect this information. I am, therefore, familiar with the work performed and the amounts charged. A chart detailing contemporaneous time entries is attached hereto as **Exhibit A**. Exhibit A includes descriptions of the work performed by the attorneys. It also reflects their regular billing rates.

Gibson, Dunn &
Crutcher LLP

1

DECLARATION OF JAMES P. FOGELMAN IN SUPPORT OF DEFENDANT USC KECK SCHOOL OF
MEDICINE'S MOTION FOR ATTORNEYS' FEES AND COSTS

052

5. The work that Gibson Dunn attorneys have performed in connection with this matter has included, but is not limited to: reviewing Plaintiff's voluminous filings; researching and analyzing Plaintiff's claims; researching and reviewing Plaintiff's litigation history; researching and drafting three motions to dismiss and an anti-SLAPP motion; researching and drafting oppositions to Plaintiff's preliminary injunction motions, motion for leave to amend, and motion for reconsideration; and meeting and conferring with Plaintiff and his attorneys.

6. I personally have spent over 8.3 hours in connection with the matter. Shannon Mader spent over 48 hours on the matter, and Katarzyna Ryzewska spent over 167 hours on the matter. The total number of hours spent by all attorneys was 223.3. All told, USC incurred well over $182,925.97 in attorneys' fees to date, with approximately $142.384.95 incurred in the Prior Action and $40,541.02 in the present action, with approximately $5,092.64 attributable to the anti-SLAPP Motion to Strike (entries highlighted in blue in Exhibit A). Additionally USC incurred $1,009.32 in costs, with $371.34 in costs from the Prior Action ($168.80 of which is recoverable under L.R. 54-3.10 – entries highlighted in green in Exhibit A), and $637.98 from the present action ($104.53 of which is recoverable under L.R. 54-3.10 – entries highlighted in green in Exhibit A). USC is seeking a total of $182,925.97 in attorneys' fees plus $1,009.32 in costs by way of this Motion. This total represents the total amount charged to the client, but not the significant amount of time and resources expended by Gibson Dunn in defending themselves in the present action. Based on my experience, I believe these fees were reasonably and necessarily incurred.

7. Based on my experience, including bringing and defending against various motions to dismiss, anti-SLAPP motions, and motions for preliminary injunctions, I believe that the attorneys' fees incurred by USC in this matter were both necessary and reasonable, particularly given the successful outcome of USC's Motion to Dismiss and anti-SLAPP Motion. I also believe that USC staffed and litigated this case in a reasonable, efficient, and appropriate manner. The work has been performed primarily

Gibson, Dunn &
Crutcher LLP

2

053

1    by three attorneys, one partner, one of counsel, and one associate, with the associate
2    performing the largest share of the work for efficiency purposes.

3       8.    This amount does not reflect the significant amount of time and resources
4    expended by Gibson Dunn, USC's counsel of record, in defending themselves in the
5    present action.

6       9.    It is my belief that the fees charged by Gibson Dunn are reasonable. I have
7    attached hereto as **Exhibit B** a true and correct copy of the Public Rates report, published
8    by Thomson Reuters, showing the prevailing rates for California attorneys. The Public
9    Rates report shows that the rates charged by Gibson Dunn are within the range of rates
10   charged generally by similar firms engaged in similar work. For instance, the rates
11   charged by Pachulski Stang Ziehl Young Jones & Weintraub in the 2019 *Sedgwick LLP*
12   matter in the Northern District are roughly equivalent to the rates charged by Gibson
13   Dunn here. Moreover, the hourly rates charged by Gibson Dunn for this matter are lower
14   than the rates charged by the firm generally. The fact that thousands of sophisticated
15   clients are willing to, and do, pay these rates on an ongoing basis is, in itself, evidence
16   that the rates reflect the reasonable value of the services rendered by Gibson Dunn.

17       I declare under penalty of perjury and under the laws of the United States of
18   America that the foregoing is true and correct. I have executed this declaration in Los
19   Angeles, California on February 18, 2020.

By: _____

James P. Fogelman

3

Gibson, Dunn &
Crutcher LLP

054

1  James P. Fogelman, SBN 161584
   Shannon E. Mader, SBN 235271
2  Katarzyna Ryzewska, SBN 300386
   GIBSON, DUNN & CRUTCHER LLP
3  333 South Grand Avenue
   Los Angeles, California 90071-3197
4  Telephone: (213) 229-7000
   Facsimile: (213) 229-7520
5  JFogelman@gibsondunn.com
   SMader@gibsondunn.com
6  KRyzewska@gibsondunn.com

7  Attorneys for Defendant
   USC Keck School of Medicine
8

9              UNITED STATES DISTRICT COURT

10            CENTRAL DISTRICT OF CALIFORNIA

| 11 | DR. JEFFREY ISAACS, | CASE NO. 2:19-CV-08000-DSF-RAO |
|---|---|---|
| 12 | Plaintiff, | **DECLARATION OF SHANNON MADER IN SUPPORT OF DEFENDANT USC KECK SCHOOL OF MEDICINE'S MOTION FOR ATTORNEYS' FEES AND COSTS** |
| 13 | v. | |
| 14 | USC KECK SCHOOL OF MEDICINE. GIESEL SCHOOL OF MEDICINE AT | |
| 15 | DARTMOUTH, DARTMOUTH HITCHCOCK MEDICAL CENTER, | [Defendant's Notice of Motion and Motion for Attorneys' Fees and Costs, |
| 16 | NH BOARD OF MEDICINE, GIBSON, DUNN & CRUTCHER, LLP and JOHN | Declarations of James P. Fogelman and Katarzyna Ryzewska, and Proposed Order |
| 17 | or JANE DOE, | Filed Concurrently herewith] |
| 18 | Defendants. | **Hearing** |
| 19 | | Date: March 30, 2020 |
| 20 | | Time: 1:30 PM<br>Location: Courtroom 7D |
| | | Judge: Hon. Dale S. Fischer |

21

22

23

24

25

26

27

28

DECLARATION OF SHANNON MADER IN SUPPORT OF DEFENDANT USC KECK SCHOOL OF MEDICINE'S
MOTION FOR ATTORNEYS' FEES AND COSTS

# DECLARATION OF SHANNON MADER

I, Shannon Mader, declare:

1.  I am an attorney duly licensed to practice before this Court. I am of counsel with the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), and I am one of the attorneys of record for USC Keck School of Medicine ("USC") in this action. I am submitting this declaration in support of USC's Motion Attorneys' Fees and Costs. I have personal knowledge of the facts set forth herein and if called as a witness, I could and would competently testify hereto.

2.  I graduated from Georgetown University in 1991 and from the UCLA School of Law in 2004. I was admitted to the California Bar in 2004, and I have been an attorney with Gibson Dunn since 2005. During this time, my practice has included a wide range of civil litigation matters, including antitrust, RICO, law firm defense, hospitality and gaming, and intellectual property matters. My current standard hourly billing rate is $985/hour. My rate standard hourly billing rate for 2019 was $915.

3.  As with all of my matters, and in accordance with Gibson Dunn's policies, I recorded my time personally, and on a weekly basis, for all the work that I performed in connection with the this matter.

4.  I personally spent over 48 hours in connection with this matter, not counting time spent on USC's Motion for Attorneys' Fees and Costs.

5.  I have reviewed Exhibit A to the Fogelman Declaration, It accurately reflects the fees that I billed in this matter, all of which were necessarily incurred. I declare under penalty of perjury and under the laws of the United States of America that the foregoing is true and correct. I have executed this declaration in Los Angeles, California on February 18, 2020.

By: _____

Shannon Mader

1

1 James P. Fogelman, SBN 161584
Shannon E. Mader, SBN 235271
2 Katarzyna Ryzewska, SBN 300386
GIBSON, DUNN & CRUTCHER LLP
3 333 South Grand Avenue
Los Angeles, California 90071-3197
4 Telephone: (213) 229-7000
Facsimile: (213) 229-7520
5 JFogelman@gibsondunn.com
SMader@gibsondunn.com
6 KRyzewska@gibsondunn.com

7 Attorneys for Defendant
USC Keck School of Medicine
8

9 UNITED STATES DISTRICT COURT

10 CENTRAL DISTRICT OF CALIFORNIA

| 11 | DR. JEFFREY ISAACS, | CASE NO. 2:19-CV-08000-DSF-RAO |
|---|---|---|
| 12 | Plaintiff, | **DECLARATION OF KATARZYNA RYZEWSKA IN SUPPORT OF DEFENDANT USC KECK SCHOOL OF MEDICINE'S MOTION FOR ATTORNEYS' FEES AND COSTS** |
| 13 | v. | |
| 14 | USC KECK SCHOOL OF MEDICINE. GIESEL SCHOOL OF MEDICINE AT | |
| 15 | DARTMOUTH, DARTMOUTH HITCHCOCK MEDICAL CENTER, | [Defendant's Notice of Motion and Motion for Attorneys' Fees and Costs, |
| 16 | NH BOARD OF MEDICINE, GIBSON, DUNN & CRUTCHER, LLP and JOHN | Declarations of Shannon Mader and James P. Fogelman, and Proposed Order Filed |
| 17 | or JANE DOE, | Concurrently herewith] |
| 18 | Defendants. | **Hearing** |
| 19 | | Date: March 30, 2020 |
| 20 | | Time: 1:30 PM |
| | | Location: Courtroom 7D |
| | | Judge: Hon. Dale S. Fischer |

21

22

23

24

25

26

27

28

Gibson, Dunn & Crutcher LLP

DECLARATION OF KATARZYNA RYZEWSKA IN SUPPORT OF DEFENDANT USC KECK SCHOOL OF
MEDICINE'S MOTION FOR ATTORNEYS' FEES AND COSTS

1

# DECLARATION OF KATARZYNA RYZEWSKA

2

I, Katarzyna Ryzewska, declare:

3    1.    I am an attorney duly licensed to practice before this Court. I am an
4  associate with the law firm of Gibson, Dunn & Crutcher LLP ("Gibson Dunn"), with
5  over 5 years of experience, and I am one of the attorneys of record for USC Keck School
6  of Medicine ("USC") in this action. I am submitting this declaration in support of USC's
7  Motion Attorneys' Fees and Costs. I have personal knowledge of the facts set forth
8  herein and if called as a witness, I could and would competently testify hereto.

9    2.    I graduated from University of Illinois at Chicago in 2011 with a Bachelor
10  of Arts, and I received my J.D. cum laude from University of Michigan Law School in
11  2013. Over years of practice, I have worked on general litigation, employment litigation,
12  transnational litigation, intellectual property litigation, oil & gas litigation, and in a
13  variety of other matters. My current standard hourly billing rate is $895/hour. My rate
14  standard hourly billing rate for 2019 was $815.

15    3.    As with all of my matters, entered my time entries personally for all the
16  work that I performed in connection with the this matter on a weekly basis in accordance
17  with Gibson Dunn's policies.

18    4.    I personally spent over 167 hours in connection with this matter, not
19  counting time spent on USC's Motion for Attorneys' Fees and Costs.

20    5.    I have reviewed Exhibit A to the Fogelman Declaration, It accurately
21  reflects the fees that I billed in this matter, all of which were necessarily incurred. I
22  declare under penalty of perjury and under the laws of the United States of America that
23  the foregoing is true and correct. I have executed this declaration in Los Angeles,
24  California on February 18, 2020.

25

26    By: _____

27    Katarzyna Ryzewska

28

Gibson, Dunn &
Crutcher LLP

1

DECLARATION OF KATARZYNA RYZEWSKA IN SUPPORT OF DEFENDANT USC KECK SCHOOL OF
MEDICINE'S MOTION FOR ATTORNEYS' FEES AND COSTS

FILED

2019 SEP 16 AM 11: 09

CLERK U.S. DISTRICT COURT
THE ANGELES CALIF
EV

1    Dr Jeffrey Isaacs

2    3553 West Chester Pk #177

3    Newtown Square, PA 19073

4

5

6    **UNITED STATES DISTRICT COURT**

7    **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

8

9

10   DR. JEFFREY ISAACS

                            Plaintiff,

11

     vs.

12   USC KECK SCHOOL OF MEDICINE,
     GEISEL SCHOOL OF MEDICINE AT DARTMOUTH,
13   DARTMOUTH HITCHCOCK MEDICAL CENTER,
     NH BOARD OF MEDICINE,
14   GIBSON DUNN & CRUTCHER LLP,
               and
15   JOHN or JANE DOE

                            Defendants.

16

17

**CV19-8000 MWF(JEMx)**

Case : 19-CV-

**PLAINTIFF'S COMPLAINT
FOR DAMAGES,
DECLARATORY, AND
INJUNCTIVE RELIEF**

DEMAND FOR JURY TRIAL

18

19

20

21

22

23

24

Isaacs v. USC et al
Case No. 19-CV-

**PAID**

SEP 1 6 2019

Clerk, US District Court
COURT 4612

1

## PLAINTIFF'S COMPLAINT

## FOR DAMAGES, DECLARATORY, AND INJUNCTIVE RELIEF

### I.  INTRODUCTION

1. Plaintiff Jeffrey Isaacs enrolled in the USC Keck School of Medicine Class of 2009 in what by all means seemed to be the beginning of a promising medical career. By the end of the first semester, somewhat by accident he found himself in possession of evidence of corruption and abuse of power an NIH director and the Dean of Keck. Specifically, a dispute had arisen where a Class of 2009 classmate bragged to him and threatened him regarding 'connections' that got her into Keck, and verifiable electronic mail routing records furthered revealed her purported claims.

2. Plaintiff noticed a lawsuit on a federal cover sheet, and the next day USC sent armed guards into Plaintiff's medical school classroom, to serve a retaliatory stay-away letter. About a week later Plaintiff sent another pleading document, indicating the aforementioned NIH connection with the Deans. The Deans, within several days, directed the aforementioned student's ex-boyfriend to write a complaint that would ultimately get Plaintiff expelled. There began the fourteen-year pattern of RICO obstructive behavior meant to intimidate a federal witness that ultimately included destroyed emails, destroyed medical records, perjured testimony, illegal campus ban threats, and over a decade of denied federally-funded education opportunities.

3. After protracted litigation and negotiations with Keck, two settlement agreements were reached that acquitted Isaacs of charges, sealed all disciplinary records, dismissed all administrative charges, and cancelled all contracts between the parties. Years went by; Isaacs excelled without further incident at international medical school with training in London as

well as Mount Sinai New York and Cleveland Clinic, and achieved a top decile national board score higher than the average neurosurgeon, his intended medical specialization.

4.  But, Keck figured out a way to defeat the Settlement Agreements as soon as they went into effect, by using a third party AAMC clearinghouse database to disseminate Plaintiff's sealed records and forever tarnish his reputation. Keck knowingly and intentionally withheld this AAMC evidence from 2008 federal discovery production to prevent Plaintiff from learning of the breach and to entice him into signing the Global Settlement Agreement. This concealment cost Plaintiff literally the past decade of unnecessary legal proceedings, as he only discovered the hidden AAMC profile this year. In other words, he was duped by USC for a decade as he diligently went about his medical studies thinking the matter was sealed.

5.  During this same ten-year period, the Keck Dean and his two successors would be alleged or found guilty of serious abuses of power, including using Schedule II substances, i.e. crack cocaine, with students, as well as harassing junior medical researchers. Furthermore, the Department of Justice would initiate charges of widespread admissions impropriety at USC. Those two facts, however, weren't known at the time Isaacs began studies at Keck. He was ousted from the university, and immediately brought foreboding claims of 'favoritism' and 'scapegoating' in this District Court.

6.  Plaintiff's medical achievements and legal persistence fueled an organized and relentless retaliation against him that continues to the present day. With his newly achieved medical diploma, Dr. Isaacs began residency training at Dartmouth. Knowledge of the sealed USC controversy, whereby John Doe proffered further information and advice on the AAMC leaks, reached Dartmouth's medical school some five years after it began. John Doe's identity has been never been revealed by the Defendants and the Defendants have taken steps to conceal

Isaacs v. USC et al
Case No. 19-CV-

3

his or her identity. Motivated by John Doe's influence, Isaacs' arrival at Dartmouth was met with the strongest resistance. He was treated unethically and suffered extraordinary stress. Dartmouth terminated Isaacs without the normal peer review hearing process required by hospital bylaws.

7. Former Dartmouth & World Bank President Jim Yong Kim was notified to preserve evidence for federal court review of the circumstances. Within a week, Dr. Isaacs' emails and medical records at Dartmouth completely disappeared. Ultimately, the corruption extended from high academia to government officials. Dartmouth sent the sealed Keck records to the New Hampshire Board of Medicine. The Board, in turn, published the false, sealed records on the internet in an outrageous fake order that declared the records had never been sealed.

8. Such activity precisely captures why Congress enacted the RICO Act – to prevent and expose the infiltration of legitimate institutions by corrupt individuals. To be sure, each institution named in this lawsuit is an otherwise venerable institution where the Plaintiff did, and does, seek to resume his medical research career. The Defendants executed constant, longstanding, and corrupt schemes intended to deprive Plaintiff of his medical career. Indeed, Plaintiff's fourteen year saga to practice medicine is unheard of for a physician with his top academic ranking and no other bar to employment.

9. As a jury shall determine, Defendants willfully violated civil and criminal RICO statutes over a fourteen year period by recruiting new individuals to carry out an orchestrated pattern of retaliations, due process violations, and judicial obstructions meant to prevent Dr. Isaacs from ever becoming a doctor. As if fourteen years of health problems and delays in his career weren't enough, last month Defendant Gibson Dunn unilaterally decided to restrict Plaintiff's rights and liberties in Los Angeles, further tarnish his reputation, and intimidate him away

Isaacs v. USC et al
Case No. 19-CV-

4

1     from Los Angeles by issuing a lifelong USC premises ban – in stark violation of the Due

2     Process clause.

3                       **II.**     **JURISDICTION AND VENUE**

4     12. Venue in the California Southern District is proper under 28 U.S.C. § 1391, because the

5     dispute transpired and originated in the district. Additionally, the settlement agreements and

6     disclosures by John or Jane Doe, central to this case, necessarily stemmed from this district.

7     The Plaintiff was retaliated against, for fourteen years, because he was a witness in an official

8     proceeding in this district.

9     13. Jurisdiction in this Court arises under 28 U.S.C. § 1331, for federal questions presented

10     pursuant to 18 U.S.C. § 1965 (RICO). Diversity jurisdiction is invoked pursuant to 28 U.S.C. §

11     1332. Subject matter jurisdiction for declaratory relief exists under 28 U.S.C. § 2201 and 2202

12     and Rule 57 of FRCP, because an actual justiciable controversy exists. Injunctive relief is

13     sought under aforementioned code and *Bivens* doctrine of implied cause of action.

14                       **III.**     **PARTIES**

15     14. Plaintiff Dr. Jeffrey Isaacs is a citizen of the United States. Dr. Isaacs holds an A.B. from

16     Dartmouth College, an MBA from Wharton/Insead, and an M.D. issued in 2010 from the

17     American University of the Caribbean. He began medical training with Defendant Keck in

18     2005. Fourteen years after federal controversy commenced, the Defendants continue to

19     improperly prevent him from obtaining necessary federally funded residency (GME) training

20     for medical licensure.

21     15. Defendant New Hampshire Board of Medicine ("The NH Board") is a New Hampshire

22     government organization, formed as a group of individuals who convene at 121 South Fruit

23     Street, Suite 301, Concord, NH 03301-2412 under the color of New Hampshire state law. The

24

Isaacs v. USC et al
Case No. 19-CV-

1      individuals, specifically, include prosecutor and investigator Jeff Cahill, administrator Penny

2      Taylor, and the voting members of the Board. Claims against "the NH Board" are invoked

3      against both the organization, as defined under NH RSA, as well as the aforementioned

4      individuals, who shall be considered to be enumerated defendants in the caption of this

5      lawsuit.

6      16. Defendant Dartmouth Hitchcock Medical Center is a non-profit corporation with a principal

7      address of One Medical Center Drive, Lebanon, NH 03756. Defendant Dartmouth Hitchcock

8      Medical Center does not have a registered agent in the State of New Hampshire. Plaintiff was

9      a salaried employee of Mary Hitchcock Memorial Hospital, related to DHMC, but was a

10      student trainee of Dartmouth College.

11      17. Defendant Geisel School of Medicine is a DBA for Trustees of Dartmouth College which has

12      a principal office address at 63 South Main Street, Ste. 301, Hanover, NH 03755 and no

13      registered agent. According to its webpage, the Board of Trustees "has ultimate responsibility

14      for the financial, administrative and academic affairs of [Dartmouth] College.' Plaintiff's

15      applications to study GME have been declined as recently as the 2019 academic year by

16      faculty employed by or associated with the College. For convenience, causes of action

17      against "Dartmouth" and "Dartmouth Defendants" refer to both DHMC & Trustees of

18      Dartmouth College, because Plaintiff was both a GME student at Dartmouth Medical School

19      and a salaried employee of their teaching hospital. Historically, Graduate Medical Education

20      participants are considered students of their trade and receive a diploma upon 'graduating'

21      residency. To the extent the Dartmouth College professors in this matter were also attending

22      physicians at DHMC, both roles are invoked independently and simultaneously.

23

24

1   18. Defendant USC Keck School of Medicine ("Keck") is located at 1975 Zonal Avenue in Los

2       Angeles, in the Southern California District. In 2008, Plaintiff and Keck settled a lawsuit in

3       this district, CV-06-3338-GAF. This complaint alleges witness retaliation to present day for

4       disclosure of federal violations disclosed during the litigation.

5   19. Defendant Gibson Dunn & Crutcher LLP ("Gibson Dunn") is a Los Angeles based law firm

6       located at 333 Grand Avenue, Los Angeles California 90071.

7   20. Information about John and/or Jane Doe will be amended when available.

8                           IV.    **FACTUAL HISTORY**

9   21. The original complaint in a previously filed related RICO action was finalized on March 11,

10      2019 as CACD case 19:cv:02011-DSF-RAO. That case was dismissed without prejudice by

11      Plaintiff after substantial new evidence was found (see AAMC Profile discussion below) and

12      after Defendant Gibson Dunn issued an illegal, lifelong campus ban against Plaintiff. Some

13      defendants had claimed the related case lacked jurisdiction because it was served two days

14      late, and that the process server failed to state the exact height and age of a served party.

15      Moreover, Plaintiff has retained legal counsel which will be further amending this case, if

16      necessary, upon Answer by the Defendants. For all of these reasons, this new process was

17      necessary to avoid complex and unnecessary motion practice in the prior process.

18  22. In these 2019 claims, and a related 2006 CACD lawsuit, the Plaintiff alleged admissions

19      corruption, as well as an administrative cover-up and retaliation, that happened shortly after

20      he matriculated into the Class of 2009 M.D. program at the Keck School of Medicine at

21      University of Southern California. On March 12, 2019 federal RICO charges in "Operation

22      Varsity Blues" were formally filed against USC for corrupt and criminal admissions

23

24

Isaacs v. USC et al
Case No. 19-CV-                                                                              7

1    procedures. The aforementioned federal investigation exposed widespread bribery, favoritism,

2    and other corruption in USC's admissions process.

3    23. During the first semester at Keck, Plaintiff commenced a relationship with a fellow Keck

4    Classmate, one A.B. As the matter turned sour, A.B. made threatening statements to the

5    Plaintiff, such as "I got into Keck through my connections, I'll get a residency through my

6    connections, don't mess with me." [1]

7    24. At the time, email return receipt technology was new and developing.  An electronic message

8    Plaintiff had sent to A.B. started registering return receipts at NIH headquarters and the

9    Zilkha Neuroscience Center Executive Office at Keck.

10    25. Plaintiff was concerned that A.B. was fostering rumors and gossip among classmates, and

11    extending, he believed, to scientists at Zilkha her father knew. Plaintiff, who had a semester at

12    Vanderbilt Law completed, sent a cease and desist letter on a United States District Court

13    cover sheet to A.B demanding "inappropriate communications with Zilkha" officials cease,

14    thinking it would be the end of it. He was wrong; sixty pages follow in this complaint of

15    abbreviated events and claims that would follow him for fourteen years.

16    26. Little did Plaintiff know, the Zilkha scientist was in fact the Dean of Keck, Brian Henderson.

17    Henderson had recently been promoted to deanship after raising $40 million for the Zilkha

18    institute, at least in part with NIH funds controlled by A.B.'s father.

19    27. Shortly thereafter, USC armed guards served Plaintiff with a "stay-away" order from

20    classmate A.B. Also at the suggestion of the Keck Administration, A.B. sought to press

21

22    [1] Indeed, A.B. has attained faculty appointment at Harvard Medical School, while Plaintiff –
with his higher merit scores – has spent well over a decade trying to correct the wrongs
inflicted by the Defendants.

23

24

charges with the LAPD against the Plaintiff. The LAPD declined to press charges related to the petty dispute. Plaintiff contended the "stay-away" order was being used by A.B. to embarrass him amongst his classmates.

28. Plaintiff learned in February 2006 that the Zilkha scientist's true identity was Dean Henderson. He immediately went to Dean Clive Taylor attempting to mitigate the circumstances, and said "I'm being kicked out for accidentally blackmailing the Dean," to which Taylor replied "Sometimes Jeff, you get a raw deal in life."

29. Plaintiff emailed an apology to A.B., hopeful it was the best way to resolve the situation. A.B. initially accepted the apology, and emailed the Dean that she didn't want to be responsible for further disciplinary action against Plaintiff, who she said "wasn't a [bad] person."

30. However, the Junior Keck Dean, Peter Katsufrakis, hauled Plaintiff before the Keck Student Performance Committee, and disciplined him. In truth, the Deans disciplined Isaacs to discredit, and out of anger for, his federal criminal and civil claims, which included abuse of office, corruption and bribery. This reasoning was not communicated to the voting faculty members, who were instead given Plaintiff's "apology email" as a pretextual termination reason. Formally, the SPC charged Plaintiff with inability "to maintain Essential Characteristics & Abilities" of a Keck student, resulting in separation from the university. Katsufrakis' corrupt and retaliatory actions initiated Keck's role in the management and operation of an illegal enterprise (See *Exhibits* – Letter from Attorney Nina Marino). To the extent later settlements may have waived claims against Keck, a private criminal waiver contract does not legally preclude criminal charges. RICO is a criminal and civil cause of action, and thus Plaintiff did not waive RICO claims.

31. Plaintiff was hospitalized with what appears to have been an Adjustment Disorder, in other words mental trauma from losing his place in medical school.

32. Plaintiff filed a federal lawsuit, CV-06-3338-GAF, against Keck, Henderson, Katsufrakis, and A.B's father. For unknown reasons, in 2007 Deans Henderson and Katsufrakis left their Deanship posts at Keck. Additionally, A.B's father left the NIH to move to Okinawa, Japan.

33. Exhaustive settlement discussions took place over nearly two years. See *Complaint Exhibits* (Pages 1-100) & *Affidavit of Dr Jeffrey Isaacs*, both of which are hereby incorporated entirely herein as facts in this complaint. Plaintiff's attorney Michel Payne exited discussions with USC Counsel, citing "unprofessional" conduct in simultaneously dishonoring settlement offers and riding out the discovery clock.

34. Nonetheless, two settlement agreements were reached over these two years. The first agreement, the "Individual Settlement," sealed Isaacs' disciplinary records, in exchange for Isaacs dropping any claims against the individuals, i.e. Katsufrakis, Henderson, and R.B.

35. Keck drafted the Individual Settlement days after Isaacs filed the "Zilkha tracking evidence" in court for the first time, which they also threatened to sanction him for filing. That settlement dismissed the individual defendants from the suit, including the USC Dean and a National Institutes of Health official. Paragraph 2 of that Agreement was entitled "Sealing of Disciplinary Records," and read:

"In exchange for the Dismissal with Prejudice of the Individual Defendants, referenced above, Defendant USC agrees that commencing immediately upon the execution of this Settlement Agreement and receipt of the signed Dismissal with Prejudice, *USC will not release or disclose Isaacs' disciplinary records to any third party*, including but limited to

other educational institutions and/or potential employers, unless it receives written consent from Isaacs or a subpoena or court order."

36. There was no consideration for Isaacs in the Individual Settlement other than the "factual innocence" provided by a record seal. Both the intent, and plain language use of "sealing" in the agreement were unambiguous to both parties. California Code 851.8 sealing procedures for factual innocence and exoneration were intended to apply, analogously, in this educational sealing, to which there was no direct statutory authority. Isaacs accepted the Individual Settlement offer in September 2007, and in related correspondence had stated "By completely sealing and clearing my record at USC, your client will be removing any burden on me to disclose these events in future career endeavors. I have been fortunate enough to receive a second chance [at medical school]."

37. The additional intent of the settlement was to allow Isaacs, who was entering his second year of medical school at AUC, to move on and continue his career in medicine.

38. A second settlement, the Global Settlement agreement between USC and Dr. Isaacs ended the litigation with that institution. The excerpted paragraph 8 of that agreement stated that, "[a]s a material inducement to Isaacs to enter into this Agreement, USC does hereby irrevocably release, acquit and forever discharge Isaacs from any and all charges . . . obligations, promises, agreements . . . of any nature whatsoever, known or unknown . . ." *Id.*

39. This settlement agreement further dismissed any outstanding administrative charges against Dr. Isaacs. Likewise, it acquitted him of charges of failing to "maintain Essential Characteristics" which lead to his discipline, in a redundant exoneration to the Individual Settlement agreement.

40. But the primary intent of the Global Settlement, negotiated over eighteen months, was to allow Isaacs the relatively "minor point" of not having to disclose his mere attendance at USC in the future. It did this by annulling any contracts between the parties. Comparatively, one may deny any retroactively annulled contract.

41. This agreement was drafted by Keck days after a teleconference between Isaacs and USC Counsel, in which he informed them discovery would also address claims of unusual abuse of power, and predatory tactics, by Dean Katsufrakis.

42. Both of Katsufrakis' successors likewise were terminated from USC for abuse of power and sexual misconduct. Dean Carmen Puliafito was found to have provided and used crack cocaine with a twenty year addict. Dean Rohit Varma was terminated for sexually harassing a young researcher. This constitutes a pattern of failed deanship supervision.

43. In sum, both of Isaacs' claims that USC suffered from a pattern of inadequate supervision and reporting procedures for Dean misconduct, and that USC turned a blind eye to a pattern of admissions bribery, would prove true a decade later.

44. According to USC Counsel who drafted the Global Settlement, she "re-opened the issue to have USC advise [Plaintiff] of his need to disclose the academic history." Hours later, she sent him the final Global Settlement, with revised language stating "the parties further agree that Isaacs is not required to disclose this matter to anyone."

45. USC provided expert advice, coercion, guarantee, promises, and/or suggestions that the Global Settlement annulled the enrollment contract and the respective academic history was thereby, in entirety, subject to confidentiality clauses "not requiring" disclosure to any third party.

Isaacs v. USC et al
Case No. 19-CV-

1    46. Based primarily on the quoted language of the two settlement agreements and the advice of

2        USC, and his attorney at the time, Dr. Isaacs understood that anything relating to his

3        attendance at Keck was sealed and could not be disclosed by anyone, including Dr. Isaacs.

4    47. There are very few civil cases of sealed disciplinary academic records, and little legal

5        precedent as to how they should be handled by the courts.

6    48. Well known entities that can be sealed and rightfully disavowed include criminal arrests,

7        marriages, and other serious matters. There is no known law in any United States jurisdiction

8        forbidding a university from likewise contracting with a student to seal and/or annul a

9        discipline.

10   49. Here, a relevant federal statutory regulation is 20 U.S. Code § 1232g - Family educational and

11       privacy rights.

12   50. Specifically, the provision dealing with disciplinary records is instructive:

13           "(h)Disciplinary records; disclosure

14           Nothing in this section shall prohibit an educational agency or institution from—

15           (1) including appropriate information in the education record of any student concerning

16           disciplinary action taken against such student for conduct that posed a significant risk to

17           the safety or well-being of that student, other students, or other members of the school

18           community;  or (2) disclosing  such  information  to teachers and  school   officials,

19           including teachers and school officials in other schools, who have legitimate educational

20           interests in the behavior of the student. (i) Drug and alcohol violation disclosures" 20 U.S.

21           Code § 1232g.

22   51. In simple terms, FERPA and other routine liability laws normally would grant Keck an

23       absolute right and duty to disclose a student's disciplinary records to another university with a

24

vested interest. Moreover, FERPA would require Isaacs to consent before Keck releasing his records to third parties.

52. By "sealing" the disciplinary records so that future disclosure would be prohibited even to interested parties, and hence outside the realm of FERPA, Keck expunged Isaacs' student record. If those records had not been expunged/annulled with these settlement agreements, Keck would be in violation of FERPA and other statutory and common liability laws by failing to report the discipline to an educational institute with an interest in knowing.

53. With reliance upon the fact that the settlement agreements placed his issues at Keck behind him, Isaacs proceeded in an international medical program, and finished ahead of schedule in 3 ½ years without incident.

54. His medical training included clerkship training at St. George's University London, Cleveland Clinic Florida and Mt. Sinai School of Medicine (NY). Dr. Isaacs received strong reviews, mostly honors, from supervising professors at more than twelve different clerkships at the aforementioned institutions.

55. Dr. Isaacs received his medical degree in 2010 after he scored a 99/99, placing him in the top decile on the highly competitive United States Medical Licensure Exam Step 1. The USMLE is administered by the NBME in Philadelphia, whose president is Dr Peter Katsufrakis. (See *Amended Complaint Exhibits* Page 64, Announcement of President Katsufrakis' NBME Presidency)

56. In what can only be described as a malicious scheme, Keck never sealed Plaintiff's disciplinary records; USC was in immediate breach of the Individual Settlement as soon as it was signed in 2007. Keck knew of this fact and took active steps to conceal the breach from

Isaacs v. USC et al
Case No. 19-CV-

14

1      Isaacs, so that he would sign the Global Settlement Agreement in 2008. This scheme was

2      discovered by Plaintiff and his counsel in 2019, as described below.

3   57. Within twenty-four hours of Plaintiff's dismissal from Keck, it appears Katsufrakis logged

4      into the AAMC website and disseminated this information nationally through their

5      clearinghouse (*Exhibits*, Page 97). This would be consistent with other actions by Katsufrakis,

6      such as sending a malicious letter to Plaintiff within hours of his discharge from a month-long

7      hospitalization (See *Exhibits*, Attorney Nina Marino letter).

8   58. The AAMC profile is a clearinghouse source secondary to the primary source, in this case the

9      Office of the Registrar at USC. As can be seen on the Exhibit, USC has full authority (and

10     responsibility) to edit and update the information as appropriate.

11  59. Hence in 2006, Katsufrakis printed a screen shot of the "AAMC profile," and placed it in

12     Plaintiff's KSOM Student File, which was generally maintained at that point by Katsufrakis,

13     and contained dozens and dozens of peculiar handwritten notes by Katsufrakis purporting to

14     counsel Plaintiff.

15  60. In 2008, USC Counsel Dal Soglio transmitted Plaintiff's entire "KSOM student file" to

16     Plaintiff, as part of a discovery request for production in cv-06-3338. The Bates numbers for

17     the entire production ranged from 281-549. (See *Exhibits* Pages 95-96)

18  61. *Critically*, the AAMC profile was missing from the KSOM student file when it was

19     transmitted to Plaintiff in 2007.

20  62. *This intentional omission had a devastating and sinister impact*: Plaintiff would proceed with

21     a four year MD program, graduate, and apply to programs; all of these programs would see

22     the Keck disciplinary history, but Plaintiff would be under the false impression they had been

23     sealed. In short, programs throughout the country would look at Plaintiff, unfairly, as a liar.

24

63. Had Defendants properly conveyed the AAMC profile to Plaintiff, he would immediately have instructed them to update the AAMC records to reflect the fact they had been sealed and rendered factually innocent.

64. Had they refused to at that point, he would have immediately sought judicial enforcement of the Individual Settlement Agreement. Furthermore, he would never have signed the Global Settlement until the issue was properly resolved. In short, Keck duped Plaintiff into believing he could put the matter behind him, settle the case, and focus on his medical studies. Keck knowingly defrauded Plaintiff and hid records which showed they were already dishonoring their settlement agreement.

65. There is no dispute the AAMC Profile was improperly withheld, which constitutes fraudulent concealment under civil contract common law and/or grounds for rescission under California Code. Moreover, the act amounts to a predicate act of obstruction of justice under federal RICO law.

66. The AAMC Profile reappeared almost a decade later in KSOM Student Records later obtained through the district courts. Additionally, attempts by AAMC to clarify the status of the disciplinary records went unresponded to by the USC Registrar. As a result, the AAMC, in consultation with its general counsel, expunged all aspects of its investigation and concluded Plaintiff's Keck records were sealed and accorded factual innocence. (See *Exhibits*).

67. In sum, Plaintiff's fourteen year nightmare could largely have been avoided had USC played fairly and honored their settlement agreement, and not withheld critical documents from discovery. As this complaint will demonstrate below, Plaintiff was unfairly vilified when he arrived at future training programs who believed he had improperly withheld disclosure of Keck. To them, it was as simple as seeing the history on the AAMC website. To Plaintiff,

074

1    with total ignorance of the AAMC Profile, he was simply adhering to confidentiality clauses

2    of the settlement. This situation – ironic at best – was calculated by Katsufrakis and USC,

3    experts in medical education standards, to "throw down a spike" as a long term impediment

4    (See *Exhibits*, Skadden Arps Attorney letter).

5    68. In July 2011, Isaacs was admitted to a federally funded Graduate Medical Education program

6    ("medical residency") at Dartmouth Medical School, and their associated teaching hospital,

7    DHMC/Hitchcock.

8    69. Dartmouth had access to AAMC Educational History records of all applicants, including

9    Plaintiff. In other words, from the time of his application, Dartmouth had computer access to

10   the AAMC profile. Dartmouth, like many other programs, faulted Plaintiff for the discrepancy

11   between his CV and the AAMC profile. Because Keck had never properly sealed the records,

12   schools like Dartmouth incorrectly viewed Plaintiff as a liar.

13   70. Not only did Dartmouth legally have access to the AAMC profile, but they did indeed access

14   this information and learn of the Keck matter before Plaintiff even began his residency at

15   Dartmouth.

16   71. Numerous witnesses at Dartmouth, including Dr Finn, perjured themselves when they falsely

17   declared in federal deposition that they did not learn of the Keck matter until some six months

18   after Plaintiff began residency. As a result, lawsuit determinations and summary judgments

19   based upon these perjured statements are incorrect and cannot be used to invoke *res judicata*

20   in this process.

21   72. Within days of arriving at Dartmouth, Isaacs' health took an immediate and substantial turn

22   for the worse. Previously able to work thirty hour surgery shifts, suddenly Isaacs had

23   difficulty staying awake for more than three hours at a time.

24

Isaacs v. USC et al
Case No. 19-CV-                                                                                    17

73. Another resident, who Isaacs has never met to this day, sent a complaint to Dartmouth's Internal Medicine Program Director, Harley Friedman, asserting she heard about Isaacs' mistreatment and felt his supervisor, Dr. Khagi, should be replaced, and that Isaacs be given "necessary support."

74. Dr. Friedman wrote back to the complainant, dismissing her concern, and coercing her to turn on Isaacs. This evidences the beginning of Dartmouth's involvement in a longstanding pattern of predicate acts, by recruiting other individuals at Dartmouth to violate and suppress Isaacs's rights as a student physician.

75. Dr. Khagi ordered Isaacs to conduct two digital rectal exams (DREs) during his first 2-3 days of residency.

76. The exams were unnecessary for medical treatment. One patient had terminal metastatic cancer, and to this day, Isaacs recalls the patient's discontent when he was informed he needed a prostate exam to look for a "cancer source" per Dr. Khagi's instruction.

77. The exams were not for medical training.

78. The exams were meant to humiliate Isaacs for his past at Keck.

79. A plethora of other false situations were created for Isaacs. He was often left in silence as his supervisors watched him not knowing what to do in a new hospital, and purposefully failed to instruct him.

80. Dartmouth accepted federal funds to train Isaacs. Residency training is a privilege and right largely subsidized by the United States Federal Government. All fifty states require participation in federally funded residency training in order to obtain a medical license. The federal government allocates approximately $200,000 per year, per resident, to training facilities such as Dartmouth. A resident can expect upwards of USD$1 million invested by the

government in his/her Graduate Medical Education program. The inherent value of this training exceeds the cost to the government. No other country spends anywhere near as much money as does the United States to train its physicians in residency. There are no residency programs directly run by the United States government; they are all outsourced to "academic medical centers" such as Dartmouth.

81. Dartmouth's schemes to humiliate Isaacs denied him any semblance of reasonable training. As such, Dartmouth benefitted inappropriately from receipt of federal funds, and deprived Plaintiff of the full inherent value of a residency.

82. Dartmouth learned about Isaacs' Keck enrollment and discipline through AAMC records and other sources. Dartmouth learned additional information through John Doe, who they have refused to identify during seven years of related litigation.

83. At least six Dartmouth administrators, under oath in federal depositions, falsely stated they learned of Keck at the end of Isaacs' six months of internship employment, no earlier than January 2012.

84. These administrators committed perjury in order to shield claims against themselves and further the enterprise of harming Isaacs career and reputation. Had Dartmouth admitted they possessed knowledge of the sealed Keck records in June 2011, it would support the timeline alleged by Isaacs' claims of mistreatment. Thus, they chose to commit further predicate acts, submitting perjured testimony that they only learned about Keck in January 2012.

85. In fact, in early November 2011, Harley Friedman interviewed Isaacs's replacement from his same Caribbean medical program, one Jeremy Whyman MD. Until then, Dartmouth had never accepted a student from the Caribbean school.

Isaacs v. USC et al
Case No. 19-CV-

19

86. Upon information and belief, no later than November 2011, Dartmouth sought Isaacs' medical records from Keck, the Caribbean, and other places he had studied. Both the interview and records request timing evidences the aforementioned perjury allegations, as well as the AAMC profile access.

87. Dartmouth directly communicated with the schools Isaacs had previously attended.

88. Dartmouth even emailed Isaacs' Wharton MBA program subsidiary in France to obtain records.

89. Dartmouth was obtaining these records to corroborate the information they had from John Doe concerning Keck.

90. John Doe provided personal knowledge of the Keck student records and litigation directly to Dartmouth; it is unclear if they also sought direct confirmation of discipline from Keck, which, under FERPA, "nothing shall prohibit." John Doe provided Dartmouth with the Global Settlement Agreement, as it was in court records, but neglected to cite the Individual Settlement. There has been the suggestion that John Doe effectively duped Dartmouth into joining his retaliatory enterprise by omitting mention of the Individual Settlement, and the record sealing, from the information he conveyed. As a result, Dartmouth was convinced Plaintiff had "lied to them," and began the inappropriate actions described above.

91. Dartmouth was ultimately left with a dilemma of both having information about the sealed records, causing the ongoing situation of widespread mistreatment of Isaacs at his internship, and their knowledge in fact that their sealed legal status was improper to use against Isaacs. In short, the dilemma escalated over six months with Dartmouth unable to handle the situation in any ethical or legal fashion.

92. Dartmouth refuses to answer, despite years of discovery requests, how and when exactly they had learned that Dr. Isaacs attended Keck.

93. Around Thanksgiving 2011, one Jeffrey Simon MD told Plaintiff "I don't know what you did in your past, but you're right, they're trying to get rid of you."

94. On October 12, 2011, Dr. Isaacs completed an actigraph study with Dartmouth's Sleep Medicine program to document his inability to stay awake. The results of this study were that Dr. Isaacs was unable to stay awake for more than 3 hours at work due to hazing and mistreatment.

95. The results of this actigraph study would later disappear under questionable circumstances. Dartmouth violated numerous state and federal medical records and patient rights regulations when they intentionally deleted his sleep study.

96. The Plaintiff became aware of claims against Dartmouth early January 2012 for IIED and fraud, and informed Dartmouth that there would be a Federal lawsuit filed and that all evidence should be preserved.

97. Plaintiff made this request through an email letter to College President Jim Yong Kim, notifying him of pending litigation in the United States District Court. The email specifically indicated that all ESI evidence should be preserved.

98. The college had a duty under Federal Law to preserve relevant evidence and was noticed of this duty no later than January 15, 2011.

99. Despite that notice, the Plaintiff's computer and email accounts with Dartmouth Hitchcock Medical Center were disabled on January 17, 2011 and scheduled for deletion.

100.    Isaacs noticed his account login was disabled and telephoned DHMC IT support on or around January 17, 2011.

101.   IT support told Isaacs that his supervisors ordered the deletion of his electronic accounts.

102.   IT support further informed Isaacs that automatic safety mechanisms were preventing the deletion for approximately another week.

103.   Isaacs desperately emailed Finn, Jim Yong Kim, and others, pleading to reverse their order to destroy his electronic login and email access.

104.   Finn was aware of Isaacs' litigation notice to Jim Yong Kim at the time she ordered deletion of Isaacs' electronic (eDH) files. (See Exhibit).

105.   Finn had referenced the litigation and complaints to Jim Yong Kim in emails she sent to others in her department on or around January 15, 2012.

106.   Finn and Kim, with coordination from Dartmouth attorneys, formed a consortium that worked to commit felonious evidence destruction.

107.   There can be no doubt, *res ipsa loquitor*, that Finn and Jim Yong Kim purposefully and intentionally ignored Isaacs' pleas not to delete his eDH accounts.

108.   Normally, an eDH account would only be deleted after an employee is properly terminated through due process including a fair hearing. As such, this email destruction occurred at least two months earlier than it should have.

109.   The willful destruction of Isaacs' eDH accounts constitutes a felony under United States Code. 18 U.S.C 1519.

110.   Dartmouth, via its attorneys, would later argue to the Court that automatic processes caused the destruction of Isaacs' eDH accounts.

111.   Dartmouth knew that the felony code has exemptions for ESI deletions caused by automatic processes.

112.    As stated, the only relevant automatic processes in this case were safety mechanisms to prevent the deletion of the ESI.

113.    No automatic process caused the deletion of Isaacs' eDH ESI.

114.    Dartmouth could have revoked Plaintiff's eDH access without destroying the emails; the destruction was simply not necessary nor legal unless he had been properly terminated.

115.    Finn and Jim Yong Kim's decision to delete Isaacs' eDH files caused the deletion.

116.    Dartmouth, via statements made by their attorneys, defrauded the Court by suggesting automatic processes were to blame.

117.    The deletion of Dr. Isaacs' electronic accounts severely limited his ability to support his well-founded claims in the District Court and in administrative proceedings. In other words, Dartmouth had an unwarranted victory in the District Court, and other venues, by destroying evidence.

118.    Dartmouth used fraudulent means and information to prevent the further discovery and prosecution of their felonious email destruction. For example, they claimed to recover Isaacs' emails by searching the outboxes of his correspondents, but omitted hundreds of emails from this purported search. The email spoliation as described happened over an extended period of time requiring multiple conscious acts of obstruction; it was not an isolated event.

119.    Dartmouth terminated Isaacs in March 2012, without having ever placed him on formal probation. Probation is a due process guaranteed by various contractual and accreditation guidelines applicable to Isaacs' residency at Dartmouth. Defendant Finn and Kim sought to deny Isaacs this right.

120.    Dartmouth terminated Isaacs in March 2012, without having ever allowing him a "Fair Hearing" amongst Dartmouth peer physicians. "Fair Hearing" is a due process guaranteed by

1       various contractual and accreditation guidelines applicable to Isaacs' residency at

2       Dartmouth. Defendant Finn and Kim sought to deny Isaacs this right.

3       121.       Dartmouth terminated Isaacs in March 2012 by sending him a letter via US Mail,

4       falsely accusing him of concealing his Keck records, and falsely accusing him of not

5       disclosing other records from Arizona.

6       122.       Dartmouth knew the Keck records in fact had been expunged. Dartmouth had an

7       absolute, unfettered right via FERPA to confirm or deny the expungement of the Keck

8       records. Dartmouth nonetheless sent the false letter via US Mail , which constitutes Mail

9       Fraud under the United States Code.

10       123.       During a NHES hearing, Dr Donald West testified that Isaacs' actions at Dartmouth

11       did not constitute dishonesty.

12       124.       Dr West's testimony was 'lost' immediately after the NHES hearing.

13       125.       The pattern of lost and withheld documents in this long saga is clear violation of

14       federal obstruction laws.

15       126.       At least one civil federal lawsuit was concluded adversely to Plaintiff, as a result of

16       Dartmouth defendants submitting knowingly false and fraudulent information to the court.

17       One such case was in the New Hampshire district, lawsuit CV-12-40-LM. To the extent any

18       further *res judicata* claims prevailed, Dartmouth had unwarranted victories in additional

19       processes. Judicial notice of that decision, and third party employment decisions based upon

20       the obstructed civil lawsuit, have caused further direct damages to Plaintiff financially and

21       reputationally.

22       127.       That lawsuit alleged that Plaintiff had become medically impaired from mistreatment

23       at Dartmouth. The lawsuit concluded with summary judgment which did not include the

24

Isaacs v. USC et al
Case No. 19-CV-

24

1    spoliated evidence. Plaintiff's own medical providers formed erroneous diagnoses based upon

2    the outcome of the litigation & his employment termination. Defendants' perjury of key dates

3    and destruction of emails had a real and long lasting impact, even affecting how medical

4    providers would view Plaintiff's distress (i.e. whether or not it was due to IIED versus another

5    medical cause).

6    128.    Nothing in the summary judgment declared that Isaacs was permanently barred from

7    federally funded residency training, nor that his future applications to Dartmouth should not

8    be given all due consideration.

9    129.    Indeed, uncontested witness statements in that lawsuit's record included senior

10   program directors' statements that "Isaacs medical knowledge was perfectly acceptable," and

11   that "his reviews were quite positive." Isaacs primary supervisor (representing 80% of his

12   clinical time at Dartmouth, aka his non-call time), Dr Donald West, gave him an outstanding

13   performance review. Plaintiff's duties were either on-call or non-call. Dr West represented the

14   entire assessment of non-call, and as stated, passed him with good marks. Plaintiff's last on-

15   call assessment was by Dr Cynthia Schwartz, who passed him with good marks. Dartmouth

16   would rely on a fabricated on-call incident, per Dr Riblet, to bring performance complaints

17   against Isaacs. Hence, but for fabricated reports, Isaacs had good marks and passed his

18   assessments at Dartmouth.

19   130.    In a deposition, Dr Christine Finn testified that she would "defer to the AAMC" and

20   other competent authorities, with regards to interpretation of the Keck settlements. She never

21   did.

22   131.    The NHES, New Hampshire Employment tribunal determined that Isaacs non-

23   disclosure of Keck records was permissible, because he believed it to have been expunged.

24

Isaacs v. USC et al
Case No. 19-CV-                                                                                    25

132.    Similarly, the AAMC closed an investigation, in Isaacs' favor, upon legal review of the Keck settlements.

133.    Dartmouth and the NH Board of Medicine (see below) defied two prior competent authorities, when they faulted Isaacs for non-disclosure of Keck.

134.    Under an applicable standard of willful falsification and gross misrepresentation, Dartmouth and the NH Board incorrectly faulted Isaacs for interpreting the Keck settlement agreements the same way as the AAMC and NHES.

135.    In other words, they continue to accuse Isaacs of dishonesty for adhering to the two settlement agreements using reasoning accepted by the AAMC and NHES.

136.    At the conclusion of cv-12-40, Isaacs believed that despite the setback at Dartmouth, he still had a future medical career. Commonly, resident physicians who suffer medical ailments forcing them to abandon a medical residency, are then permitted to return to federal GME training after being rehabilitation. Hence after cv-12-40's MSJ, there existed no reason Isaacs could not hope and expect he would at some point be able to return. This was especially true after Finn's deposition agreeing to accept the AAMC outcome.

137.    However, years of applications to Dartmouth and appeals of the NH Board false orders have made it apparent that the Defendants succeeded in permanently barring Isaacs from residency and licensure.

138.    It is exceptionally rare, if not unheard of, for someone with Isaacs credentials, and no criminal record or other bar to employment, to be kept out of training for seven years.

139.    Indeed, Dartmouth didn't even acknowledge receipt of Isaacs most recent application to GME for the 2019 academic year. Such treatment evidences Dartmouth's vendetta against

Isaacs ever becoming a doctor. They accepted application fees but never honestly considered his application, for six years in a row.

140.     Dartmouth attorneys have responded that Isaacs cannot "resuscitate claims against Dartmouth by reapplying each year." Such a statement means that Dartmouth does not welcome Isaacs' 2018 application to their federally funded program.

141.     In June 2019, in this very action, DHMC's own attorneys declared (MTD p.11) that "Plaintiff continues to set himself up for rejection by re-applying for residency." Dartmouth acts as an arbiter of federal funds, each and every year, for independent and new applications to their program. Moreover, Plaintiff submits an application fee, each and every year, for a new independent application to GME at Dartmouth. On at least two different occasions, DHMC's attorneys have suggested that his application is a waste, that it will not be considered, that he will not even receive an application acknowledgment. It matters not if Plaintiff's health has changed, or if their own Director Finn declared she would "accept the AAMC determination" re Keck. Dartmouth has decided it will retain Plaintiff's application fees, and federal funds to act as a fair arbiter and gatekeeper to the residency application process, but will not consider the application as a new, independent event. They will rely on their retaliatory stance – and regular way of doing business dating back to 2011 – bar Plaintiff at all costs from their federal program.

142.     Such statements declare that Dartmouth believes Isaacs should be permanently barred from federally funded GME medical training at their facility, despite being qualified. This amounts to illegal retaliation against Isaacs, in violation of federal witness retaliation laws. Likewise these continual denials of access evidence an overall open-ended scheme, pursuant

1       to RICO, to retaliate against the Plaintiff for making civil and criminal complaints against

2       members of their enterprise, or possessing evidence supporting such claims.

3       143.     Plaintiff's 2019 application to residency at Dartmouth is a new, independent

4       application.

5       144.     It warrants consideration of the facts at time of application, i.e., in 2019.

6       145.     Even if a 2011 determination was correct (it wasn't) that Plaintiff incorrectly withheld

7       Keck from his 2011 application, a 2019 application should look at all new facts that may have

8       changed since 2011 to determine Plaintiff's candidacy in the 2019 application.

9       146.     Plaintiff's 2019 application to Dartmouth is honest and forthcoming, in light of rather

10       complex settlement ramifications.

11       147.     As a result, Plaintiff's application to 2019 at Dartmouth could be approved, by an

12       unbiased and impartial arbiter/gatekeeper of federal funds who determines past performance

13       and honesty concerns were either remedied, rehabilitated, or historically incorrect/out of

14       proportion.

15       148.     Furthermore, an impartial arbiter who had been made fully aware of the content and

16       circumstances of 1) deleted Dartmouth emails, 2) perjured Dartmouth testimony, and 3) Jim

17       Yong King's recent resignation would be especially likely to re-admit Plaintiff,

18       acknowledging he was never given a fair chance at residency.

19       149.     Similar to the termination letter sent to Plaintiff, Dartmouth caused a false letter to be

20       sent to the New Hampshire Board, where they knowingly propagated false/expunged records

21       from Keck.

22       150.     Dartmouth's materially false letter to the NH Board, disguised as FERPA-proper

23       educational records, constitutes Mail Fraud under United States Code. Dartmouth knew Keck

24

Isaacs v. USC et al
Case No. 19-CV-                     28

1  should not release the sealed discipline history; they chose to send the sealed and annulled

2  records directly to the NH Board of Medicine.

3  151.    The NH Board received the Keck information and immediately assigned the matter to

4  Defendant Cahill. Cahill, in 2013, telephoned Isaacs and said "Just so you are aware, this was

5  placed on my desk from someone above. I don't want to make a mountain out of a molehill."

6  152.    Dartmouth had recruited individuals at the NH Board to scheme and defraud, and

7  retaliate against, Isaacs.

8  153.    Cahill made no less than six attempts, over two years, to coerce Isaacs to settle. In one

9  email, he even said "I don't think this will affect your lawsuit with Dartmouth," but that he

10  "needed" Isaacs to admit wrongdoing via Keck.

11  154.    The New Hampshire Board of Medicine (the "Board") found that Dr. Isaacs had

12  improperly failed to disclose his "criminal stalking" and Keck enrollment on his residency

13  application.

14  155.    Setting aside its incorrect claim that Dr. Isaacs had a criminal record, which he

15  did/does not, the Board not only rejected Dr. Isaacs' reliance on the settlement agreements but

16  also disclosed the facts of the Keck circumstances contained in documents that the agreements

17  had sealed.

18  156.    In so doing, the Board violated the court-entered settlement agreements and, worse,

19  forever tarnished Dr. Isaacs' reputation.

20  157.    The Board withheld critical exonerating evidence from the public, namely, the first

21  Keck settlement agreement.

22  158.    The Board falsely stated to the public that "there is no provision sealing the records."

23

24

Isaacs v. USC et al
Case No. 19-CV-                                                                                29

159. The Board also declared that, upon information and belief, USC failed to complete their end of the settlement agreement, specifically, they failed to release any outstanding administrative charges. Releasing outstanding administrative charges was one of the plain-text requirements of the second Keck settlement agreement.

160. If true, Defendant USC's failure to release administrative charges against Isaacs represents an additional predicate act of obstruction of justice and/or due process violations.

161. Counterintuitively, the Board blamed Isaacs for USC's failure to release administrative charges, despite conceding that USC had breached their contractual duty.

162. Such an argument goes beyond mere error, and represents Cahill and the Board's ongoing attempt to participate in the predicate acts and scapegoat Isaacs. The Board order itself evidences a *mens rea* to join and please the enterprise formed by the Defendants.

163. Cahill's statements evidence his intention to obstruct justice and due process by issuing false statements and withholding key evidence from a state proceeding.

164. To date, the Board's only defense, argued in recent federal court motions, is that there was "no clearly established right" for Cahill to include the Keck settlement exonerating evidence in his order. In other words, the Board doesn't contest their Order is false. They merely contest that Isaacs had any due process right to a true Order, or an order that took into consideration evidence favorable to Isaacs.

165. Further evidencing their involvement in the enterprise, the Board failed to investigate Khagi for the unnecessary DREs he ordered. Plaintiff sent repeat requests for investigation, over a two year period, only to be ignored.

166. By ignoring their duty to investigate any of Isaacs' claims, and issuing knowingly false documents against him, the NH Board, via its officers, repeatedly obstructed justice and

Isaacs v. USC et al
Case No. 19-CV-

30

denied Plaintiff due process, in the act of joining the co-Defendants efforts to end Isaacs' medical career.

167.    In mid-2014, the Board first published the above false orders on the internet, and national medical board sanction action databases/clearinghouses. The Board continues to publish these documents in 2019. The Board is aware they contain materially false and damaging information.

168.    As a result of false declarations of "stalking crimes," the years following 2014 publication, Isaacs became further ostracized from former colleagues, friends, neighbors, and even had AirBNB reservations cancelled.

169.    Despite being reasonably optimistic that justice would prevail in a timely fashion, over time, Isaacs had to reasonably conclude that the actions of the Board and other Defendants permanently ended his medical career and caused severe reputational harm.

170.    It would be unrealistic and unfair to have expected Isaacs to have fully realized this injury in 2014, at the first instance of publication of a related order. Indeed, Isaacs never reasonably anticipated an appeals process where the Board would admit their Order was false, but not retract it. In 2014, Isaacs still reasonably believed that ultimately the truth behind his settlement agreements would prevail, and that he would ultimately graduate from a GME program.

171.    Reputational and career harm of this magnitude are extraordinary and took months to years to fully process and understand the implications thereof.

172.    Isaacs has applied to Dartmouth's residency program for each year inclusive, 2013, 2014, 2015, 2016, 2017, 2018, and 2019.

173. The co-Defendants wish to permanently prevent Isaacs from ever being a practicing physician, despite Dartmouth's own Dr Friedman and Dr West testimony that Isaacs had "good" medical knowledge and was a good resident, respectively. As such, they have not considered seven separate residency applications over seven years, as they have a duty to do as arbiters and operators of a federal training program. Each residency refusal is an illegal retaliation under 18 U.S.C. § 1513, and/or other anti-retaliation laws.

174. Likewise, each and every adverse event referenced above is an illegal retaliation, deprivation of due process, and or obstruction of justice intended to thwart a 2007 federal court ordered settlement agreement, a 2012 New Hampshire United States District lawsuit, or other related processes and appeals and law enforcement complaints.

175. Plaintiff has been prevented from discovering the full scope of predicate acts via federal discovery because of Defendants willful obstruction of discovery law.

176. RICO has both civil and criminal causes of actions. Plaintiff seeks both civil and criminal prosecution of the herein described RICO violations. Plaintiff has properly noticed the Department of Justice of these civil and criminal RICO claims.

177. Jim Yong Kim offered his resignation from his appointment as President of the World Bank, upon information and belief, after certain government entities raised questions pertaining to the violations detailed herein. Kim's resignation, in part or in whole, provides new information that substantiates and/or confirms Plaintiff's allegations of fraudulent concealment and evidence spoliation. New evidence that Defendants employed fraudulent means to spoliate evidence and offer false testimony prohibits further *res judicata* dismissal of Plaintiff's fourteen year claims that he has a right to participate in federally funded medical training.

178.    Plaintiff voluntarily dismissed *Isaacs v. Department of Justice* once he was satisfied his complaints against Jim Yong Kim had been addressed by at least one branch of the United States Government, resulting in appropriate redress, namely, Kim's resignation.

179.    The NH Board of Medicine only recently declared that despite Cahill's clear error in withholding the first settlement agreement, they would not correct the record because there was no "clearly established right" for Plaintiff to have due process and a true public board order.

180.    As a result of the aforementioned fraudulent concealment, and lengthy delays in the previous related lawsuits, the full nature of Plaintiff's injuries have been difficult to precisely ascertain.

181.    A jury shall determine that Dr Isaacs' currently cannot practice medicine as a result of a pattern of illegal, retaliatory behaviors initiated by John Doe in connection with Keck, spanning over fourteen years, and ultimately involving Dartmouth and the NH Board officers.

V.    **CAUSES OF ACTION**

**COUNT I**
**DECLARATORY JUDGMENT**

182.    Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

Isaacs v. USC et al
Case No. 19-CV-    33

183.  There exists a genuine and bona fide dispute and an actual controversy between the parties as to the obligations of Keck under the Individual Settlement and Global Settlement agreements.

184.  Pursuant to the Uniform Declaratory Judgment Act, Plaintiff in good faith requests that the Honorable Court declare the following:

(a) Plaintiff and Keck formed the two settlement agreements over a two year period, with particularity and due consideration given to each and every term in the agreements.

(b) Keck and the Plaintiff had brought cross allegations and charges that the settlements were meant to dismiss. The charges against Plaintiff were "failure to demonstrate the Essential Characteristics" of a Keck student physician. The charges against Keck and the Individuals included abuse of power, bribery/favoritism, and retaliation.

(c) Plaintiff's only consideration in the Individual Settlement was the sealing of his Keck disciplinary records, i.e., the SPC administrative charge of not maintaining "Essential Characteristics" that formed the basis for his expulsion.

(d) The parties did not cite any statutory authority defining sealed academic records, and indeed, none are known to exist.

(e) The plain intent of sealing the records, evidenced by email communications, was for Keck to "remove any burden on Plaintiff to disclose these events in future" medical career endeavors.

(f) In other words, Keck agreed to render "factual innocence" to Plaintiff in exchange for his dismissal of the case against Katsufrakis, Henderson, and Baughman.

(g) "factual innocence" and exoneration are applicable in respective California Penal Code, and may be analogously applied here to academic administrative charges.

(h) The law permits two private parties great authority and breadth to contract with one another in freedom. USC, a private institute, was permitted to contract to "factual innocence" and "exoneration" of Plaintiff, in recognition of possible wrongful determinations by their faculty, and they did so.

(i) The American Academic of Medical Colleges and New Hampshire Employment Security tribunal were the first competent authorities to review this matter.

(j) Both entities determined that the settlements were consistent with "factual innocence" and/or exoneration, and permitted Plaintiff's non-disclosure of the aforementioned charges.

(k) These two determinations were fair and reasonable.

(l) Keck legally contracted with Plaintiff to afford him "factual innocence" and to allow him to put the matter, as a matter of fact and law, behind him.

(m)The Global Settlement agreement, redundantly, acquitted Plaintiff of the aforementioned charges.

(n) The Global Settlement agreement, redundantly, dismissed Plaintiff of any administrative charges, including that of unprofessional conduct.

(o) Under both Settlement Agreements, it would be a breach for USC/Keck to disclose the charges as if they hadn't been discharged, rendered "factually innocent," or otherwise impede on the intent of the settlements.

(p) The Global Settlement agreement annulled all contracts between the parties, including the enrollment agreement.

(q) A party such as the Plaintiff is allowed to disavow the existence of an annulled contract, in this case, enrollment.

Isaacs v. USC et al
Case No. 19-CV-

35

(r) On the day the Global Settlement was reached, USC examined the issue of Plaintiff's disclosure liabilities to third parties regarding academic enrollment history.

(s) The settlement stated that USC agreed that Isaacs need not disclose any of the USC Keck discipline or academic enrollment history to any third party.

(t) The effect of the two settlements renders Isaacs enrollment and discipline at USC Keck a legal nullity, as Attorney Michael Payne testified in 2011.

(u) By not listing USC discipline or enrollment history on related applications, Isaacs was complying with the intent of the settlement agreements, the legally permissible effects of the settlement agreements, and furthermore, academic advice from USC contained therein.

(v) Nothing in the settlements served as a voluntary lifelong campus ban, in other words, Plaintiff never agreed not to get medical care at USC facilities , visit public lectures, art, music and cultural events, or conduct commerce with USC students and staff.

(w) Nothing in the settlements served as an agreement by Isaacs to pay USC's attorneys fees should USC breach the agreements and result in Isaacs filing a lawsuit, such as this, for damages, declaratory, injunctive, or equitable relief.

## COUNT II
### Breach of Contract
### (Keck Defendants)

185.     Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

186.     Plaintiff and Keck entered into two contracts, the Global and Individual Settlement agreements.

187.  Plaintiff complied with the agreements, believing they had been court enforced and valid. As a Caribbean applicant to residency, disclosing Keck attendance may have helped his applications, but nonetheless, he did not disclose any of the matter to third parties.

188.  Keck was obliged under the agreements to annul their prior contracts with Plaintiff.

189.  Keck was obliged to dismiss administrative charges, including the SPC charge of unprofessional conduct.

190.  Keck was obliged to acquit the plaintiff of all charges.

191.  Keck was required to seal disciplinary charges, rendering Plaintiff "factually innocent."

192.  The NH Board of Medicine found "no evidence" Keck dismissed administrative charges against Plaintiff in 2014 (in part because they must have been aware of the widespread AAMC dissemination, but chose not to reveal that to avoid implicating Dartmouth). The Board order, containing many inaccuracies, was appealed and cert was denied in June 2015. At that point in time, Plaintiff became reasonably suspicious, and informed, that Keck was not complying with the Settlement Agreements.

193.  Keck has never taken action to comply with the settlement agreements.

194.  In fact, Keck knew it was in breach of the settlements from the time they were formed. Keck knew it was disseminating sealed records through the AAMC database.

195.  Keck took active steps to conceal the AAMC dissemination from Plaintiff, including removing the AAMC profile from his KSOM Student Record discovery production.

196.  Equitable estoppel prevents raising any Statutes of Limitations argument on this breach of contract claim, because the concealment was only discovered in 2019.

Isaacs v. USC et al
Case No. 19-CV-

37

095

197.     The Keck registrar was never informed to make the necessary changes to Plaintiff's student record, including dismissal of admin charges and sealing the charges.

198.     The aforementioned breach directly and proximately caused Plaintiff severe property loss, emotional distress, reputational and career harm, and physical stress and harm.

199.     Plaintiff became aware that this breach was intentional in May 2019.

200. Attorney Keith Mathews spent three months between April and June 2019 attempting to mediate with Keck concerns that Keck not fully complied with the settlement. Keck was asked to "resolve any breaches and assist in repairing the residency training dismissal that resulted from the breach." Keck Counsel Meyer wrote back that "USC declines" to resolve the breach or assist and mitigating damages.

## COUNT III
### IIED
### (All Defendants)

201.     Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

202.     Plaintiff has suffered severe emotional distress as a result of Keck's willful choice to dishonor their settlement contracts.

203.     No reasonable juror will find it acceptable that Keck caused Plaintiff to undertake four years of MD studies under the false belief his records had been sealed, when in fact, the records were out in the open on AAMC's database.

204.     Indeed, the intent of Keck was crooked and meant to revenge Plaintiff years down the road by making him look dishonest to future residency programs, who would see the AAMC records and assume they were valid.

Isaacs v. USC et al
Case No. 19-CV-

38

205. This lead to a reasonably foreseeable dangerous situation, where a future employer, in this case Dartmouth, would abuse harass Plaintiff so that he would resign.

206. If there was any doubt as to Keck's intent, Counsel Meyer clarified that in his 2019 email refusing to discuss or remedy Keck's breaches.

207. Wanton disregard for complying with a court ordered settlement contract, let alone a physician's career being needlessly after over a decade, is reckless and intentional behavior.

208. Counsel Meyer's recent action is extreme and outrageous. A reasonable individual informed of Plaintiff's ten year difficulty complying with the settlement agreement would not respond the way Counsel Meyer did.

209. Counsel Meyer quite simply refused to accept information about the breach in ADR, meditation, or otherwise, and refused to comply with the settlement agreement.

210. Meyer stated USC "declined" to correct the breaches.

211. Moreover, USC counsel acts as if the two settlement agreements simply don't exist; in a recent Pleading, counsel said "USC did not cause Plaintiff's omissions [of disciplinary charges]," as if the charge records had never been sealed and dismissed and acquitted.

212. Defendant Gibson Dunn illegally executed a lifelong campus ban against Isaacs to place him in a constant state of fear for his health, and to harm his reputation and bully him into dropping this lawsuit.

213. The lifelong campus ban violates federal witness intimidation laws. The elements for IIED are met or exceeded by a violation of witness intimidation laws.

214. In a civilized community, it is not tolerated to retract an agreement and act as if it doesn't exist, particularly when the agreement caused an individual to rely upon said

1    agreement and undertake four years of medical school to only be effectively barred from the

2    practice of medicine.

3    215.    Keck has taken these actions for the purpose of causing Dr. Isaacs emotional distress.

4    216.    Dartmouth has refused to even consider Plaintiff's application to federal GME, on

5    faulting him for "dishonesty" for his mere compliance with the Keck agreements.

6    217.    Dartmouth's declaration in July 2019 that Plaintiff's re-applications are "setting

7    Plaintiff up for rejection" evidences continued and improper character libel meant to inflict

8    emotional distress.

9    218.    Refusing to consider an individual from a government residency training program, in

10    perpetuity, because he is simply complying with a federal court ordered settlement agreement

11    is unconscionable in and of itself.

12    219.    The NH Board has decided to, in perpetuity, publish false and derogatory information

13    on their website and national clearinghouses.

14    220.    As a result of these actions Dr. Isaacs has suffered distress, including a myriad of

15    stress related conditions, sleep issues and other medical concerns.

16
                                    **COUNT IV**
                                    **NIED**
17                                  **(Keck Defendants)**

18

19    221.    Plaintiff repeats and re-alleges each and every allegation contained herein as if fully

20    stated under this count.

21    222.    To the extent some individual at Keck were not aware of their obligations inherent in

22    the settlement agreements, such as the registrar's office, they are liable under the NIED

23    doctrine.

24

Isaacs v. USC et al
Case No. 19-CV-                                                                                40

223. Keck had a duty to comply with the settlement agreement.

224. As Plaintiff became aware in 2019, Keck never updated the AAMC profile, breaching the agreement by disseminating sealed records through a third party.

225. Likewise, the NH Board decision finalized in June 2015 suggested Keck never dismissed administrative charges, as required by the Settlement Agreements.

226. Keck continues to recklessly, intentionally, and/or negligently disregard its obligations to Plaintiff.

227. The negligent actions of Keck officials, such as the registrar's office, and failures in their official duty to comply with a court ordered settlement agreement have proximately caused Plaintiff's emotional distress.

**Count V**
***Bivens* Implied Cause of Action**
**(Keck and Dartmouth Defendants)**

228. Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

229. Plaintiff has been actively denied participation in federally funded GME training programs operated by the Defendants. Plaintiff has top decile credentials, no criminal record, "good medical knowledge" and was a "good resident."

230. The clear reality is that these residency programs have permanently blocked Plaintiff's enrollment because, over a decade ago, he raised civil and criminal charges against a prominent Dean and scientist.

231. The Defendants employ Program Directors to make residency hiring decisions. In turn, these Program Directors act as arbiters of federal training funds. Though employed by

Defendants, they are also federal officials who have been delegated the important responsibility of appropriating federal training funds to duly qualified individuals.

232. The Program Director's refusal to admit Plaintiff, on the basis of his being a witness and filing law enforcement referrals, constitutes a violation of both his Due Process and First Amendment rights.

233. Under *Bivens*, the Court is permitted to exercise an implied cause of action against a federal official, the Program Director, who violates Plaintiff's constitutional rights. Because there exist no GME programs directly administered by the government, and because Plaintiff is being blocked from federal GME funds in an unconstitutional and retaliatory fashion stemming from his federal claims against an NIH director, a Bivens claim may proceed.

234. In addition to due process and First Amendment rights, the right to practice an occupation is a liberty interest protected by the 14th Amendment of the United States Constitution. Gibson v. Berryhill, 411 US 564 (1973).

235. Dr. Isaacs was entitled to due process before he was barred unlawfully by these Defendants from practicing his chosen profession.

236. Damages for seven years of refused GME training and injunctive relief to allow Plaintiff's GME to proceed are allowable and appropriate in this Bivens claim against a federally funded residency Program Director.

237. Between time of this SAC filing and time of adjudication, the Program Director is likely to change. A *Bivens* injunction must be against an individual, who will be identified during discovery. In this case, it is known that the individual is an appointee of the Dartmouth Defendants and he/she shall be named specifically in the appropriate injunctive order.

**Count VI**
**Intentional Interference With Contractual Relations**

Isaacs v. USC et al
Case No. 19-CV-                                                                           42

100

**(John and/or Jane Doe, NH Board, Gibson Dunn)**

238.　　Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

239.　　Contracts existed between Plaintiff and Keck, namely the Individual and Global Settlement agreements.

240.　　John Doe knew of these settlements. They were located in court records, and in all probability, John Doe negotiated these settlements as client to USC Counsel Dal Soglio.

241.　　Dartmouth has confirmed they learned about Plaintiff's Keck academic and disciplinary records via John Doe. In other words, Dartmouth concedes they learned about the records, but refuses to name the source.

242.　　By communicating Plaintiff's Keck records to Dartmouth, John Doe deliberately defeated the purpose of the agreements, namely, to limit disclosure requirements and absolve Plaintiff of future reputational and career harm.

243.　　Plaintiff was harmed, as the disclosure triggered the formation of an illegal enterprise, the inappropriate termination from federally funded GME, the inappropriate loss of his medical license, the publication of sealed facts, emotional distress, and workplace harassment.

244.　　But for John Doe's transmission of the sealed records, none of the aforementioned injuries would have occurred. John Doe provided additional continuity of the enterprise by recruiting Dartmouth to join USC's retaliatory cause, and serving as a link from USC's custody and control of student records to Dartmouth's.

245. Plaintiff has worked tirelessly with multiple attorneys and law enforcement to ascertain the identity of John Doe, but at this point in time, cannot attest to his identity without the aid of further discovery.

246. Similarly, the NH Board of Medicine has chosen, despite being notified in numerous processes, to publish a fake order to the public, which is meant to defeat Plaintiff's consideration vested by the settlement agreements.

247. Gibson Dunn has acted as an administrator of Plaintiff's contracts with USC. Gibson Dunn prevented Plaintiff from contacting the USC registrar and USC police to enforce the contracts. Gibson Dunn intimidated Plaintiff with a lifelong, or at least fourteen year, campus ban to interfere with his contractual rights. Gibson Dunn filed false or misleading legal pleadings meant to subvert the consideration and legal rights Plaintiff obtained from the settlement agreements.

## COUNT VII
### RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS (RICO)
### 18 U.S.C. § 1962(c)
### (All Defendants)

248. Plaintiff repeats and re-alleges each and every allegation contained herein as if fully stated under this count.

249. **Civil and criminal charges pursuant to 18 U.S.C. § 1962(c) (RICO) are mandated because an unequivocal pattern of obstructive behavior has been employed by the Defendants, including 1) tampering and removing a critical AAMC profile from a 2008 federal discovery production, 2) tampering and deleting volumes of hospital emails subject to a 2012 Federal Court preservation latter, 3) tampering and deleting Plaintiff's**

medical records subject to a 2012 Federal Court preservation letter, 4) deleting testimony in an NHES proceeding that was favorable and beneficial to a pending federal proceeding, 5) deleting evidence in a NH Board proceeding that was favorable and beneficial to a pending federal proceeding, 6) issuing a lifelong campus ban to intimidate a witness to a pending federal proceeding, 7) 14 years of denied education opportunities and applications to federally funded educational programs, to retaliate against a federal pleading cover sheet issued in 2006 by Plaintiff.

250. This case describes a small group of individuals with a nexus as academic medicine leaders who generally trained together, worked together, or had other ties to leading medical institutions including the National Institutes of Health, NBME, Dartmouth Medical School, and others, and, owing to a personal vendetta, coordinated predicate acts over more than a decade to successfully ruin the Plaintiff's medical career and reputation.

251. In their small world controlling billion dollar NIH grants and coveted California and Ivy league medical school spots, they successfully recruited new actors each time Plaintiff went to a new institution where they had influence. They subverted institutional policies and generally pulled strings, as evidence will show, without having to answer to anyone for years, until, upon information and belief, at least one branch of the United States government began to ask questions.

252. RICO's reach is broad and includes otherwise law-abiding businesses and persons who violate its provisions. (*Sedima, S.P.R.L. v. Imrex Co., supra,* 473 U.S. at pp. 499-500 [87 L.Ed.2d at pp. 360-361]; *Cianci v. Superior Court, supra,* 40 Cal.3d at pp. 908-909.) Gerase v. Superior Court, 31 Cal. App. 4th 1218, 1229 (CA 3rd 1995).